2009 UT 65

**DAVENCOURT AT PILGRIMS LANDING HOMEOWNERS ASSOCIATION, Plaintiff and Appellant,**

v.

**DAVENCOURT AT PILGRIMS LANDING, LC; LeGrand Woolstenhulme; Michael D. Parry Construction Company, Inc.; and John Does 1–30, Defendants and Appellees.**

No. 20070914.

Supreme Court of Utah.

Oct. 2, 2009.

A. Richard Vial, Michael B. Miller, Salt Lake City, for plaintiff.

Stephen Quesenberry, Charles L. Perschon, Provo, for defendants.

Craig C. Coburn, Zachary E. Peterson, Lincoln W. Hobbs, Julie Ladle, Stanford P. Fitts, William B. Ingram, Aaron C. Jacobs, Salt Lake City, for amici American Institute of Architects, Utah Chapter of the Community Assoc., Community Assocs. Institute, National Assoc. of Home Builders, Utah Valley Home Builders Assoc.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 Davencourt at Pilgrims Landing Townhome Owners Association (Association) appeals the district court's rulings that granted in part the Motion to Dismiss Complaint filed by Davencourt at Pilgrims Landing, LC, Le Grand Woolstenhulme, and Michael D. Parry Construction Company, Inc. (collectively, Defendants), and that denied the Motion to Amend Complaint and Reinstate Dismissed Claims filed by the Association. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 Davencourt at Pilgrims Landing (the Project) is a planned unit development. The Project is the result of the design and development efforts by Davencourt at Pilgrims Landing, LC (Developer), which is managed by its member, LeGrand Woolstenhulme. To construct the Project, the Developer contracted with Michael D. Parry Construction Company, Inc. (Builder). The Builder constructed, supervised construction, and inspected the Project for quality and compliance with building codes. When finished, the Project included thirty-eight buildings, each of which consisted of three to four attached townhomes, for a total of 145 units with appurtenant common areas.

¶ 3 The Developer planned to sell the 145 units to individual owners, but before doing so, it organized and established by a Declaration of Easements, Covenants, Conditions, and Restrictions (CC & Rs), the Davencourt at Pilgrim's Landing Townhome Owners' Association, a Utah nonprofit corporation. Pursuant to the Declaration, the Association has the obligation and duty to maintain and repair the common areas, which include exterior surfaces and roofs. The Association is also responsible for levying assessments and setting reserves to cover the maintenance and repair of the common areas.

¶ 4 Because no units had been sold at the time of the Association's establishment, the Developer was the initial owner of all the units and the controlling member. Thus the Developer, through Woolstenhulme as the trustee, the president, the secretary, and the treasurer, controlled the Association. The Developer's control of the Association continued until its marketing efforts resulted in the sale of a certain percentage of the units. The Developer then turned over control of the Association to the owners of the units (Unit Owners) and later sold the remaining units.

¶ 5 In selling the units, the Developer used a standard form real estate purchase contract for residential construction in each transaction. Also, the Developer represented and warranted that the Project (1) complied with the building code and had been inspected for such; (2) consisted of high-quality structures; (3) was in good condition and properly and fully maintained; (4) had no faulty workmanship; (5) had no water intrusion, moisture problems, or other material defects; and (6) the Association's budget and monthly assessments were accurate and adequate for future maintenance, repair, and replacement.

¶ 6 A few years after turnover of the Association to the Unit Owners, the Association learned of significant problems with the Project. Water began to seep into the buildings through the foundation, floors, porches, stucco, sidewalls, exterior walls, doors, windows, window boxes, and roofs. The water intrusion caused damage to the buildings in the form of dryrot, mold, staining, and degradation of the stucco. Upon hiring a building envelope specialist, the Association learned that the water intrusion and resulting damage stemmed from faulty design, faulty workmanship, defective materials, improper construction, and/or noncompliance with building codes. The building envelope specialist informed the Association that these flaws and defects, evident in all the buildings, were present in several latent construction defects, including: improper installation of stucco; improper stucco termination points at slabs and foundations; window boxes designed without a drainage plane, allowing water into the building cavity; improper integration of the stucco; missing or inadequate control joints in the stucco to prevent cracking; missing or improper flashings; and missing, incomplete, or improperly installed waterproofing at the foundations and walls of the units.

¶ 7 The Association also learned that before construction began, the Developer and the Builder had obtained a geo-technical study on the soil and subsurface soils of the Project. The report from the study warned that the Project would rest on collapsible subsurface soils that would cause land subsidence without proper preparation. Following construction, the land subsided. This land subsidence caused severe structural defects to the stucco and cement work and contributed to the water intrusion through the foundation, floors, porches, stucco, side-

walls, exterior walls, windows, window boxes, and roofs.

¶ 8 The Association repeatedly requested that the Developer and the Builder repair the defects, but they refused to do so. Because the Association, as required by the CC & Rs, was responsible for repair of these defects in the common areas, it turned to its reserves. But the level of monthly assessments that had been established by the Developer during its control of the Association was inadequate to fund the repair and replacement costs arising from the construction defects. To foot the multi-million dollar repair cost, the Association faced the choice of either imposing a special, unexpected assessment on each unit owner, doing nothing and risk being sued by the unit owners, or obtaining legal redress from the parties responsible. The Association filed suit.

¶ 9 In its complaint, the Association sought recovery of damages from the Developer, Woolstenhulme, the Builder, and John Does 1–30 for fifteen causes of action. The Association asserted these causes of action in the following order: (1) against the Developer, Woolstenhulme, and the Builder: negligence, nuisance, and negligence per se; (2) against the Developer and Woolstenhulme: negligent misrepresentation, misrepresentation and nondisclosure, and breach of fiduciary duties; (3) against the Developer: breach of contract, breach of express and implied warranties, and breach of contract as a third party beneficiary; (4) against the Builder: breach of contract as a third party beneficiary; and (5) against John Does 1–30: negligence, negligent misrepresentation, misrepresentation and nondisclosure, breach of fiduciary duties; and (6) against all defendants: equitable subrogation.

¶ 10 The Defendants filed a motion to dismiss pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. The district court granted the motion in part. Citing to the economic loss rule, the district court dismissed the claims for negligence, negligent misrepresentation, negligence per se, and nuisance. The district court also dismissed the claim for breach of implied warranties because Utah law does not recognize such warranties, and it dismissed the claim for breach of express warranty and breach of contract under the merger doctrine. The court denied the motion as to the remaining claims.

¶ 11 Following the issuance of *Moore v. Smith,* 2007 UT App 101, 158 P.3d 562, and the newly discovered evidence of soil subsidence, the Association filed a Motion to Amend the Complaint and Reinstate Dismissed Claims. In deciding the motion, the district court reviewed the Defendants' original motion to dismiss in light of *Moore* and the recent cases of *Smith v. Frandsen,* 2004 UT 55, 94 P.3d 919, and *Yazd v. Woodside Homes Corp.,* 2006 UT 47, 143 P.3d 283. Again citing to the economic loss rule, the district court concluded that the dismissed tort-based claims were precluded and denied the Association's motion. However, the district court granted the Association's alternative motion pursuant to rule 54(b) of the Utah Rules of Civil Procedure to certify its judgment as final. We have jurisdiction over this appeal pursuant to Utah Code section 78A–3–102(3)(j)(2008).

## STANDARD OF REVIEW

¶ 12 The decision to "grant a motion to dismiss presents a question of law that we review for correctness." *Citizens for Responsible Transp. v. Draper City,* 2008 UT 43, ¶ 8, 190 P.3d 1245. In reviewing a district court's "order of dismissal entered pursuant to rule 12(b)(6), we 'accept the material allegations in the complaint as true and interpret those facts and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff as the non-moving party.' " *Moss v. Pete Suazo Utah Athletic Comm'n,* 2007 UT 99, ¶ 8, 175 P.3d 1042 (quoting *Wagner v. State,* 2005 UT 54, ¶ 9, 122 P.3d 599).

¶ 13 We review a district court's denial of a plaintiff's motion to amend a complaint for abuse of discretion. *Swan Creek Vill. Homeowners Ass'n v. Warne,* 2006 UT 22, ¶ 15, 134 P.3d 1122. "An abuse of discretion may be demonstrated by showing that the district court relied on an erroneous conclusion of law." *Kilpatrick v. Bullough*

*Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957 (internal quotation marks omitted).

## ANALYSIS

¶ 14 This appeal presents four main issues for our decision. They are (I) whether the district court erred in dismissing the Association's claims of negligence, negligence per se, negligent misrepresentation, and nuisance under the economic loss rule; (II) whether the district court erred in dismissing the Association's implied warranty claim; (III) whether the district court erred in dismissing the Association's contract and express warranty claims under the merger doctrine; and (IV) whether the district court abused its discretion in denying the Association's Motion to Amend the Complaint and Reinstate Dismissed Claims. We address each issue in turn.

## I. THE DISTRICT COURT ERRED, IN PART, IN APPLYING THE ECONOMIC LOSS RULE

¶ 15 The Association argues that the economic loss rule should not apply because: (A) *American Towers Owners Ass'n v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1189 (Utah 1996), has been or should be overruled; (B) the unique relationships in this case make the economic loss rule inapplicable; (C) the alleged damage here falls within the "other property" exception to the economic loss rule; or (D) an independent duty exists outside the scope of the economic loss rule. We reject these first three arguments and then turn to the question of whether an independent duty should be recognized.

### A. The Economic Loss Rule Remains in Force

¶ 16 In arguing for nonapplication of the economic loss rule, the Association questions the continuing validity of *American Towers* and invites us to overrule this court's prior decision. We decline to do so.

¶ 17 We are aware of the dicta in *Grynberg v. Questar Pipeline Co.*, 2003 UT 8, 70 P.3d 1, which the Association emphasizes. In *Grynberg*, we stated, "[W]e do not find *American Towers Owners Ass'n* and *SME Industries* persuasive authority regarding the current state of the economic loss rule in . . . Utah." *Id.* ¶ 49. The Association, however, misinterprets this statement and disregards the development of the economic loss rule in our subsequent cases.

¶ 18 "The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 32, 28 P.3d 669. "[A]bsent physical property damage [i.e., damage to other property,] or bodily injury," this doctrine prohibits recovery of economic losses. *Am. Towers*, 930 P.2d at 1189. Economic losses are defined as:

> Damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property . . . as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.

*Id.* (alteration in original)(internal quotation marks omitted). In *American Towers*, this court found the economic loss rule to be "particularly applicable to claims of negligent construction" based on the construction industry's use of "detailed and comprehensive contracts that form" obligations and expectations, and it accordingly adopted the rule. *Id.* at 1190. Since *American Towers*, this court has continued to define and limit the scope and applicability of the economic loss rule in the context of construction defect cases.[1] The court of appeals has followed suit.[2]

---

1. See *Yazd v. Woodside Homes Corp.*, 2006 UT 47, 143 P.3d 283; *Hermansen v. Tasulis*, 2002 UT 52, 48 P.3d 235; *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, 28 P.3d 669.

2. See *Moore v. Smith*, 2007 UT App 101, 158 P.3d 562; *West v. Inter–Fin., Inc.*, 2006 UT App 222,

¶ 19 Moreover, even if we were inclined to overrule *American Towers*, the Utah Legislature in 2008 codified the economic loss rule in Utah Code section 78B–4–513.[3] With this in mind, we decline the Association's invitation to overrule *American Towers*. The economic loss rule remains in force and should be applied in accordance with our precedent. We next turn to the Association's arguments regarding the unique relationships that characterize this case.

*B.   The Economic Loss Rule Applies Despite Whatever Unique Relationship Exists Among the Association, Developer, Builder, and Unit Owners*

■ ¶ 20 The Association contends that because of the unique relationships among the Association, Developer, Builder, and Unit Owners, the economic loss rule does not apply. This scheme of ownership requires the Association, the real party in interest, to bear the burden of maintenance, repair, and replacement of common areas, but leaves the Association outside of the negotiations upon which the economic loss rule is based. We are unpersuaded; this relationship is not unique.

¶ 21 More than a decade ago, a condominium association in *American Towers* asserted a negligence claim for "problems with the complex's plumbing and mechanical systems." 930 P.2d at 1184. The condominium association alleged that the defendants, which consisted of subcontractors, developers, and architects, "negligently failed 'to design, construct, supervise and/or inspect the construction, and/or supply materials for the construction of the Property.'" *Id.* at 1188. Nonetheless, this court applied the economic loss rule. *Id.* at 1189–92. In a similar context, the Association now asks us to create an exception to the economic loss rule because the Association had no contract or opportunity to negotiate. For the same reasons this court first adopted and applied the economic loss rule—to promote the obligations and expectations created by contract and to pre-

serve the "intrinsic differences between tort and contract law"—we decline to do so. *Id.* at 1189 (internal quotation marks omitted).

¶ 22 We cannot ignore the contract expectations that exist among the Unit Owners, the Developer, and the Builder. "[T]o conclude otherwise would essentially impose the plaintiff['s] 'economic expectations upon parties whom the [plaintiff] did not know and with whom [it] did not deal and upon contracts to which [it was] not a party.'" *SME Indus., Inc.*, 2001 UT 54, ¶ 35, 28 P.3d 669 (quoting *Am. Towers*, 930 P.2d at 1192).

¶ 23 Furthermore, the Association's argument erodes the basis for the existence of the economic loss rule—the distinction between tort and contract law. Exempting strangers to a contract from the economic loss rule would convert a contract cause of action into one for tort. For example, although a purchaser of a home cannot recover economic losses under a negligence claim against a subcontractor, the logic behind the Association's argument would require recovery because the purchaser had no contract or opportunity to negotiate. Any existing contract action between the purchaser and the contractor and the contractor and subcontractor would no longer govern if a tort cause of action for negligence were permitted. The nature of these relationships does not alter the economic loss rule merely because a plaintiff had no contract or opportunity to negotiate a contract. A contrary rule would frustrate the economic expectations of the contracting parties and undermine the intrinsic differences in contract and negligence law.

*C.   Construction Components Integrated into a Finished Product Do Not Constitute "Other Property"*

¶ 24 The Association also argues that the economic loss rule does not apply because the alleged widespread physical damage to the units and common areas caused by water intrusion through leaky roofs, foundations,

139 P.3d 1059; *Fennell v. Green*, 2003 UT App 291, 77 P.3d 339; *Snow Flower Homeowners Ass'n v. Snow Flower, Ltd.*, 2001 UT App 207, 31 P.3d 576.

**3.** Section 78B–4–513 is not at issue on this appeal since the Association filed its complaint before the legislature enacted the statute.

and siding, falls under the "other property" exception of the economic loss rule. Specifically, the Association asserts the exception applies because components of a townhome, such as a roof or foundation, retain their separate characteristics.

¶ 25 Where a defect causes physical damage to "other property," the economic loss rule will not bar recovery. *See Am. Towers,* 930 P.2d at 1191. Although this court has never precisely defined what constitutes "other property," we have previously decided the specific issue before us. Proposing a similar argument, the condominium association in *American Towers* likewise sought the exception of "other property" by alleging that "its members suffered damage to walls, wall coverings, carpeting, wall hangings, curtains, and other furnishings." *Id.* We rejected this argument because "[t]his deterioration of the complex does not qualify for the 'damage to other property' exception to the economic loss doctrine" where the " 'property' was the entire complex itself that was constructed as an integrated unit under one general contract." *Id.* As an integrated product the owners "bought finished products—dwellings—not the individual components of those dwellings. They bargained for the finished products, not their various components. The [allegedly defective component] became an integral part of the finished product and, thus, did not injure 'other' property." *Id.* (quoting *Casa Clara Condo. Ass'n v. Charley Toppino & Sons, Inc.,* 620 So.2d 1244, 1247 (Fla.1993)).

¶ 26 Likewise, the Unit Owners here did not separately bargain for and purchase individual components when they acquired their townhomes. Rather, each purchased a finished product, which included the integral components of the roof, the foundation, and the siding. To contend that these integral components somehow retain a separate char-

acter apart from the final product of the townhome goes too far. The "other property" exception to the economic loss rule therefore does not apply in this case.

#### D. The Existence and Scope of Independent Duties

¶ 27 Where the economic loss rule is at issue, the "initial inquiry" becomes "whether a duty exists independent of any contractual obligations between the parties." *Hermansen v. Tasulis,* 2002 UT 52, ¶ 17, 48 P.3d 235. If we find that an independent duty exists under the law, "the economic loss rule does not bar a tort claim 'because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.'" *Id.* (quoting *Town of Alma v. Azco Constr., Inc.,* 10 P.3d 1256, 1263 (Colo.2000)). "The question of whether a duty exists is a question of law" and involves the "examination of the legal relationships between the parties," "an analysis of the duties created by these relationships," and "policy judgments applied to relationships." *Yazd v. Woodside Homes Corp.,* 2006 UT 47, ¶¶ 15, 17, 143 P.3d 283 (internal quotation marks omitted).

¶ 28 In the context of construction defect cases, Utah courts have found independent duties in a variety of relationships.[4] The Association argues that four independent duties exist among the parties. We address each in turn.

1. Neither the Builder, the Developer, Nor Woolstenhulme, in Their Respective Expertise and Relationships, Owe the Nonpurchasing Association an Independent Duty

¶ 29 First, the Association asks us to extend and apply the independent duty that a contractor-seller owes to a home purchaser.

---

4. *See Yazd,* 2006 UT 47, ¶ 35 143 P.3d 283 (holding that a contractor-seller owes a home purchaser "a duty to disclose information known to him concerning real property"); *Hermansen,* 2002 UT 52, ¶¶ 14, 22–23 48 P.3d 235 (imposing an independent duty to disclose "known material defects" on real estate agents based on their statutory duty to be "honest, ethical, and competent" and their "direct relationship" with pur-

chasers); *Moore v. Smith,* 2007 UT App 101, ¶ 36 158 P.3d 562 (ruling that a contractor-seller owes a duty to disclose material information to home purchaser); *West v. Inter–Fin., Inc.,* 2006 UT App 222, ¶ 22 139 P.3d 1059 (finding that real estate appraisers, similar to real estate agents, have an independent duty of care to buyers with whom a direct relationship exists).

Because of the distinctions in expertise and relationships at issue, we decline to do so.

¶ 30 In *Yazd*, we ruled that a contractor-seller owes an independent duty to a home purchaser to disclose known material information regarding the real property. 2006 UT 47, ¶ 35, 143 P.3d 283. In imposing this duty, we identified two important concepts. First, we emphasized that a contractor-seller possesses "a high degree of knowledge and expertise" compared to a home buyer. *Id.* ¶ 24; *see also Smith v. Frandsen*, 2004 UT 55, ¶ 18, 94 P.3d 919 ("[T]he law imputes to builders and contractors a high degree of specialized knowledge and expertise with regard to residential construction."). Second, we recognized a relationship wherein "the disparity in skill and knowledge" between a home buyer and contractor-seller leads the home purchaser to rely on the contractor-seller's expertise. *Yazd*, 2006 UT 47, ¶ 24, 143 P.3d 283. Privity of contract between a contractor-seller and a home purchaser, as in *Yazd*, illustrates this relationship. *Id.* Nonetheless, privity of contract is not necessary where a direct relationship exists. *See Hermansen*, 2002 UT 52, ¶ 14, 48 P.3d 235 (ruling that despite the lack of privity, a real estate agent owes an independent duty to a purchaser based on the "direct relationship between buyers, a real estate broker, and his agent"). These two concepts applied to each of the defendants before us reveal that no independent duty exists between Defendants and the Association.

¶ 31 Although we recognize in this case that Defendants possess a high degree of knowledge and expertise, the defects alleged limit the relevant knowledge and expertise to the Builder. As in *Yazd*, the Builder is deemed to have a high degree of knowledge and expertise. The Association argues that the Developer possesses a similar knowledge and expertise. In *Loveland v. Orem City Corp.*, we imposed a duty of care upon a developer to disclose to the purchaser latent conditions that made subdivided lots unsuitable, based on the developer's expert knowledge of which lots were suitable for construction. 746 P.2d 763, 769 (Utah 1987). In this case, however, the defects pled relate to the construction of the townhomes. Because the Builder constructed the townhomes, the Developer cannot be deemed to possess the degree of knowledge and expertise necessary for an independent duty.

¶ 32 There is, however, the question of the alleged soil subsidence. The Developer allegedly received a report on a geo-technical survey prior to construction. Since this report of potential soil subsidence would or should have been taken into account in the development of the townhomes, these allegations could establish facts for which the Developer would possess a high degree of knowledge and expertise necessary for an independent duty. Notwithstanding the alleged knowledge and expertise of the Builder or the Developer on this question, however, the Association lacks the requisite relationship with either.

¶ 33 Knowledge and expertise alone do not establish an independent duty; privity or a direct relationship is also required. The Association has no privity of contract or a direct relationship that would lead it to rely on any of the Defendants. Unlike *Yazd*, the Builder here was not the seller. Rather, the Developer contracted with the Builder to construct the townhomes, and the Developer sold them. Moreover, the Unit Owners, not the Association, purchased the townhomes from the Developer. These arrangements limit privity of contract to the Builder and the Developer or to the Unit Owners and the Developer. The Association lacks any kind of relationship with the Builder. And while the Association has a relationship with the Developer and Woolstenhulme, in that they created and subsequently ran the Association until the Unit Owners took control, this relationship presents no reliance based on a disparity of expertise. Accordingly, no independent duty arises under the expertise and relationship that a contractor-seller owes a home purchaser.

2. The Limited Fiduciary Duty Owed by a Developer in Control of a Homeowner's Association Falls Outside the Scope of the Economic Loss Rule

¶ 34 The Association next argues that the district court erred where it ruled that the Developer and Woolstenhulme owed

no duty or that "any duty the developer had to the homeowners association would essentially be to itself." The Association emphasizes that because the Developer and Woolstenhulme established and initially operated the Association, they owed the Association a fiduciary duty that lies outside the economic loss rule. We agree to an extent with the Association.

¶ 35 We have yet to consider what, if any, duty a developer owes where it establishes and initially controls a homeowners association. The Association urges us to impose a broad fiduciary duty under the Utah Revised Nonprofit Corporation Act. *See* Utah Code Ann. §§ 16-6a-101 to –1705 (2005). The Act requires directors and officers of a nonprofit corporation to discharge their duties in good faith, with the care of an ordinarily prudent person in a like position under similar circumstances and according to the best interests of the corporation. *Id.* § 16–6a–822. While the Act may serve as a basis for imposing a broad fiduciary duty in a nonprofit setting, the inherent conflict that a developer faces in promoting and marketing property for a profit, while simultaneously ensuring the interests of a homeowners association and its members, causes us to look elsewhere.

¶ 36 The Restatement (Third) of Property offers guidance. It recognizes that a developer owes certain limited duties to an association and its members. Section 6.20 of the Restatement provides:

Until the developer relinquishes control of the association to the members, the developer owes the following duties to the association and its members:

(1) to use reasonable care and prudence in managing and maintaining the common property;

(2) to establish a sound fiscal basis for the association by imposing and collecting assessments and establishing reserves for the maintenance and replacement of common property;

(3) to disclose the amount by which the developer is providing or subsidizing services that the association is or will be obligated to provide;

(4) to maintain records and to account for the financial affairs of the association from its inception;

(5) to comply with and enforce the terms of the governing documents, including design controls, land-use restrictions, and the payment of assessments;

*(6) to disclose all material facts and circumstances affecting the condition of the property that the association is responsible for maintaining;* and

(7) to disclose all material facts and circumstances affecting the financial condition of the association, including the interest of the developer and the developer's affiliates in any contract, lease, or other agreement entered into by the association.

Restatement (Third) of Property: Servitudes § 6.20 (2000) (emphases added). We agree with this articulation of the duties owed in such a relationship and adopt this section of the Restatement.

¶ 37 We also embrace the Restatement's concept of the fine line drawn between a typical fiduciary duty and this limited fiduciary duty. This concept arises from the nature of the developer's relationship with the association and its members. The Restatement expounds that "[t]reating the developer and its appointees to the board as trustees overstates the fiduciary component of the relationship." *Id.* cmt. a. Given the developer's self-interest, "[t]he developer cannot be expected to act solely in the interests for the association and the homeowners. Conflicts of interest are inherent in the developer's role while it retains control of the association." *Id.* While the developer thus should not be a fiduciary in the broadest sense, we are nonetheless convinced that the developer's control in this nonprofit association requires certain interests of the members and the association be protected. *See id.* This is achieved by the limited fiduciary duty.

¶ 38 In adopting this limited fiduciary duty, we recognize that it constitutes a newly-recognized independent duty of care in Utah. This recognition comports with our past treatment of independent duties. For example, we have imposed an independent duty on real estate agents, who, "though not occupying a fiduciary relationship," are "ex-

pected to be honest, ethical, and competent" and have a "direct relationship" with purchasers. *Hermansen*, 2002 UT 52, ¶¶ 14, 22–23, 48 P.3d 235. The limited fiduciary duty between a developer and an association or its members also constitutes a type of special relationship that gives rise to an independent duty. *See, e.g., Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1271 (Colo.2000) (citing to cases wherein fiduciary relationships, such as attorney-client relationship, physician-patient relationship, or insurer-insured relationship, "automatically trigger[ed] independent duties of care"). And despite the recovery of what would otherwise be considered economic loss damages, claims arising under a fiduciary duty, similar to fraud claims, lie outside the scope of the economic loss rule. *See Town of Alma*, 10 P.3d at 1263 ("[S]ome torts are expressly designed to remedy pure economic loss (e.g., professional negligence, fraud, and breach of fiduciary duty)."). Therefore, because a limited fiduciary duty constitutes an independent duty of care, tort claims brought under this duty fall outside the scope of the economic loss rule. *See Hermansen*, 2002 UT 52, ¶ 17, 48 P.3d 235.

¶ 39 This limited fiduciary duty does not permit any and all tort claims to be brought. Instead, only those tort claims that stem from this independent, limited fiduciary duty are permitted. Recovery by the Association is therefore restricted to the common areas. The Association may only bring its claims for negligence and negligent misrepresentation in relation to the Developer's and Woolstenhulme's failures to use reasonable care and prudence in managing and maintaining the common property, to establish a sound fiscal basis for the Association by imposing and collecting assessments and establishing reserves for the maintenance and replacement of common property, and to disclose all material facts and circumstances affecting the condition of the property that the Association is responsible for maintaining. *See* Restatement (Third) of Property: Servitudes § 6.20(1)-(2), (6) (2000). Consequently, the claims of negligence per se and nuisance, which the Association predicated respectively on noncompliance with the building code and the intrusion of water, do not arise from the fiduciary duty and are thus precluded by the economic loss rule.

¶ 40 Accordingly, we hold that the Developer and Woolstenhulme owed an independent duty to the Association, and we reverse the district court on this point. The Association may bring its claims for negligence and negligent misrepresentation against the Developer and Woolstenhulme insofar as the claims stem from the limited fiduciary duty owed.[5] On remand, certain factual questions regarding the scope of the fiduciary duty should be resolved, including when the Developer and Woolstenhulme relinquished control of the Association, an act that would mark the termination of the duty owed.

3. **Utah Does Not Recognize an Independent Duty to Conform to the Building Code**

■ ¶ 41 The Association urges us to adopt an independent duty to build in conformity with the building code. Although two other state courts have adopted a similar duty, we are not persuaded to do so in Utah.

¶ 42 In *Kennedy v. Columbia Lumber & Manufacturing Co.*, the Supreme Court of South Carolina held that a builder may be liable to a home buyer for a negligence claim where the builder violates an applicable building code. 299 S.C. 335, 384 S.E.2d 730, 737 (1989). Although the court noted that "a violation of a building code violates a legal duty," it did so with no analysis. *Id.* Instead it relied on its state court of appeals' decision in *Kincaid v. Landing Development Corp.*, 289 S.C. 89, 344 S.E.2d 869 (Ct.App.1986).

---

5. We note that the pending action for breach of fiduciary duty may best resolve those allegations arising under the negligence and negligent misrepresentation claims. These allegations implicate the limited fiduciary duty that a developer owes to a homeowners association and its members. Where breach of such a duty is similar to another form of negligence, duplicative recovery of the economic losses sought should be avoided.

*Cf. Moore v. Smith*, 2007 UT App 101, ¶ 36 n. 12, 158 P.3d 562 ("Because the facts required to prove both negligent misrepresentation and fraudulent concealment are similar, and the only difference between the two claims is a lesser mental state for negligent misrepresentation, we conclude that the [defendants] can be liable for only one or the other regarding each defect at issue in this case.").

Our review of *Kincaid* reveals that the court of appeals made no such mention of a legal duty; rather the court ruled that a trial court erred in charging a jury that violations of a standard building code is negligence per se. *See* 344 S.E.2d at 871–72. In *Association of Apartment Owners of Newtown Meadows v. Venture 15, Inc.*, the Supreme Court of Hawaii adopted the approach of *Kennedy*. 115 Hawai'i 232, 167 P.3d 225, 288 (2007). That court likewise noted that "a violation of a building code violates a legal duty." *Id.* (internal quotation marks omitted). But instead of undertaking its own analysis, the court relied on *Kennedy* for the proposition. *Id.*

¶ 43 From our own analysis, we do not believe that building codes create an independent legal duty for purposes of avoiding the economic loss rule. The inquiry into "the existence and scope of the duty owed the plaintiff by the defendant," *Yazd,* 2006 UT 47, ¶ 11, 143 P.3d 283, includes a determination of who owes the duty, what the duty owed is, and to whom the duty is owed. A per se rule is inappropriate.

¶ 44 No common-law duty exists that creates a duty to conform to building codes. Turning to statute, the Uniform Building Standards Act lays the foundation for building codes. *See* Utah Code Ann. §§ 58–56–1 to –20 (2007 & Supp.2008). Although section 58–56–8 creates a statutory basis for compliance with building codes, it does not by itself create the duty argued for by the Association. The plain language of that section indicates that material violations of the code occur when done "in a manner to jeopardize the public health, safety, and welfare." *Id.* § 58–56–8(2) (2007). Consequently, the statute exists to promote safety, rather than to aid in the recovery of damages. Moreover, assuming a duty is owed under the statute, that duty is to the public. If a statutory duty is to exist that lies outside the scope of the economic loss rule, we leave it to the decision of the legislature, as has been done in other states. *See Comptech Int'l, Inc. v. Milam Commerce Park, Ltd.,* 753 So.2d 1219, 1221–23 (Fla.1999) (upholding statutory cause of action that provides for recovery of damages as the result of violation of the state building codes). Given the paucity of decisions and the lack of a statutory basis under Utah law, we decline to rule that an independent duty exists under the building code. Therefore, the district court properly dismissed the Association's claim for negligence per se.

4. Utah Does Not Recognize an Independent Duty to Act Without Negligence in the Construction of a Home

¶ 45 The last independent duty the Association asks us to recognize is a duty to act without negligence in the construction of a home. The district court refused to make the "extraordinary leap" of adopting this independent duty. We likewise decline.

¶ 46 In seeking this independent duty, the Association again misinterprets our case law. Once more emphasizing the dicta in *Grynberg v. Questar Pipeline Co.* that *American Towers* is not "persuasive authority regarding the current state of the economic loss rule in ... Utah," 2003 UT 8, ¶ 49, 70 P.3d 1, and our adoption in *Hermansen* of Colorado's independent duty analysis, 2002 UT 52, ¶ 17, 48 P.3d 235, the Association contends that we abandoned the economic loss rule as set forth in *American Towers* and expressly adopted Colorado's interpretation. We have not. Although we have agreed with Colorado regarding the independent duty analysis, we have not abandoned our own line of cases interpreting and applying the economic loss rule. Nor do we wholly adopt all of the independent duties recognized by Colorado.

¶ 47 In *Town of Alma v. Azco Construction, Inc.,* the Colorado Supreme Court adopted the economic loss rule and the accompanying independent duty analysis. 10 P.3d 1256, 1264 (Colo.2000). The court then sought to reconcile its previous line of cases in which negligence claims for property damage had been allowed. *Id.* at 1265–66. In doing so, the court reasoned that *Cosmopolitan Homes, Inc. v. Weller,* 663 P.2d 1041 (Colo.1983), imposed an independent duty on a builder to act without negligence in the construction of a home. *Town of Alma,* 10 P.3d at 1265–66. This assertion was, however, more a result of post hoc rationalization to save precedent than anything else. *See A.C. Excavating v. Yacht Club II Homeowners*

*Ass'n*, 114 P.3d 862, 871 (Colo.2005) (Kourlis, J., dissenting) (noting that *Cosmopolitan Homes* as precedent is similar to a "large, venerable tree[ ] allowed to stand in the midst of a new thoroughfare" and is "inconsistent with the development of the law in this court"). "[M]easured against the economic loss rule," *see id.* at 870, we cannot adopt this duty. While protecting homebuyers may be a good public policy justification to impose a duty, the parties in this case simply lack the legal relationship necessary to find a duty. *See Yazd,* 2006 UT 47, ¶ 15, 143 P.3d 283. Therefore, we conclude that the district court properly rejected the independent duty to act without negligence in the construction of a home.

¶ 48 Having analyzed each of the proposed independent duties, we hold that the district court erred because a limited fiduciary duty existed, and we thus reverse the district court's dismissal of the Association's negligence and negligent misrepresentation claims against the Developer and Woolstenhulme. We, however, affirm the district court's remaining conclusion that no other duty existed, and we hold that it properly dismissed the negligence claims against the Builder and the negligence per se and nuisance claims against Defendants.

## II. UTAH RECOGNIZES A CAUSE OF ACTION FOR BREACH OF THE IMPLIED WARRANTY OF WORKMANLIKE MANNER AND HABITABILITY

■ ¶ 49 The Association next asserts that the district court erred by dismissing the claim for breach of implied warranties. The district court correctly noted that this court has yet to recognize such a claim in the sale of a new residence; we do so now.

¶ 50 Utah courts have historically refused to recognize an implied warranty of workmanlike manner and habitability in the context of new residential sales.[6] In *American Towers Owners Ass'n v. CCI Mechanical, Inc.,* the court explained its refusal:

> The main policy reasons behind extending an implied warranty of habitability to residential leases are the unequal bargaining position of the parties and the prospective tenant's limited ability to inspect and repair the property. *These policy reasons are not present to the same degree in the purchase of residential property.* The purchaser has the right to inspect the house before the purchase as thoroughly as that individual desires, and to condition purchase of the house upon a satisfactory inspection report. Further, if there are particular concerns about a home, the parties can contract for an express written warranty from the seller. Finally, if there are material latent defects of which the seller was aware, the buyer may have a cause of action in fraud. Therefore, *the circumstances presented to the purchaser of a residence are not closely analogous to those of a relatively powerless lessee* ....

930 P.2d 1182, 1193 (Utah 1996) (omission in original)(quoting *Maack v. Res. Design & Constr., Inc.,* 875 P.2d 570, 582–83 (Utah Ct.App.1994)). After reviewing the state of the case law from around the country, we conclude that our rule has become an anachronism.

¶ 51 During the first half of the twentieth century, the doctrine of caveat emptor in new residential construction led courts to reject implied warranties. Underlying this almost universal doctrine was the theory of equal bargaining power in contract and the ability and opportunity to inspect. 12 Thompson on Real Property § 99.06(a)(2) (David A. Thomas ed., 2d Thomas ed.2008). With the boom in post-World War II construction, the tide changed. *Id.* In the late 1950s, the first American court recognized an implied warranty in the sale of a new home. *Vanderschrier v. Aaron,* 103 Ohio App. 340, 140 N.E.2d 819, 821 (1957). Other courts followed suit in the 1960s.[7] By the 1980s, the

---

**6.** *See Am. Towers Owners Ass'n v. CCI Mech., Inc.,* 930 P.2d 1182, 1193 (Utah 1996); *Arnell v. Salt Lake County Bd. of Adjustment,* 2005 UT App 165, ¶¶ 47–48, 112 P.3d 1214; *Fennell v. Green,* 2003 UT App 291, ¶ 16, 77 P.3d 339; *Snow Flower Homeowners Ass'n v. Snow Flower, Ltd.,* 2001 UT App 207, ¶¶ 28–30, 31 P.3d 576; *Schafir v. Harrigan,* 879 P.2d 1384, 1389 (Utah Ct.App. 1994); *Maack v. Res. Design & Constr., Inc.,* 875 P.2d 570, 582–83 (Utah Ct.App.1994).

**7.** *See Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399, 402 (1964); *Schipper v. Levitt & Sons,*

minority became the majority. *See Conklin v. Hurley*, 428 So.2d 654, 656 n. 2 (Fla.1983) (citing to thirty-three states that recognize an implied warranty of habitability of new homes).

¶ 52 Today, by common law or statutory law, an overwhelming majority of jurisdictions recognize an implied warranty in the purchase of new residential property. Forty-five states have adopted an implied warranty in some form and Hawaii appears to

have done so in dicta.[8] Forty-three states provide for an implied warranty of habitability. Besides the four states that do not recognize any implied warranty, only Delaware, Nebraska, and Ohio expressly reject the implied warranty of habitability; yet those three states each provide for an implied warranty of workmanlike manner.[9] Out of the four states that have not adopted any implied warranty, two states, New Mexico and North Dakota, have not directly addressed or answered the issue.[10] The two remaining

Inc., 44 N.J. 70, 207 A.2d 314, 325–26 (1965); *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698, 711–12 (1966); *Waggoner v. Midw. Dev., Inc.*, 83 S.D. 57, 154 N.W.2d 803, 809 (1967); *Humber v. Morton*, 426 S.W.2d 554, 561–62 (Tex.1968); *House v. Thornton*, 76 Wash.2d 428, 457 P.2d 199, 204 (1969).

**8.** *See Cochran v. Keeton*, 287 Ala. 439, 252 So.2d 313, 314 (1971); *Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188, 1196 (Alaska 1975); *Columbia W. Corp. v. Vela*, 122 Ariz. 28, 592 P.2d 1294, 1299 (Ct.App.1979); *Wawak v. Stewart*, 247 Ark. 1093, 449 S.W.2d 922, 926 (1970); *Pollard v. Saxe & Yolles Dev. Co.*, 12 Cal.3d 374, 115 Cal.Rptr. 648, 525 P.2d 88, 91 (1974); *Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399, 402 (1964); *Vernali v. Centrella*, 28 Conn.Supp. 476, 266 A.2d 200, 203–04 (1970); *Council of Unit Owners of Breakwater House Condo. v. Simpler*, 603 A.2d 792, 795 (Del.1992); *Gable v. Silver*, 258 So.2d 11, 18 (Fla.Dist.Ct.App.1972); *Ass'n of Apartment Owners of Newtown Meadows v. Venture 15, Inc.*, 115 Hawai'i 232, 167 P.3d 225, 246–48 (2007); *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698, 711–12 (1966); *Petersen v. Hubschman Constr. Co.*, 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154, 1157–58 (1979); *Theis v. Heuer*, 264 Ind. 1, 280 N.E.2d 300, 306 (1972); *Kirk v. Ridgway*, 373 N.W.2d 491, 496 (Iowa 1985); *McFeeters v. Renollet*, 210 Kan. 158, 500 P.2d 47, 52–53 (1972); *Crawley v. Terhune*, 437 S.W.2d 743, 745 (Ky.1969); *Indus. Roofing & Sheet v. J.C. Dellinger Mem'l Trust*, 751 So.2d 928, 939 (La.Ct.App.1999); *Banville v. Huckins*, 407 A.2d 294, 296 (Me.1979); *Loch Hill Constr. Co. v. Fricke*, 284 Md. 708, 399 A.2d 883, 887 (1979); *Albrecht v. Clifford*, 436 Mass. 706, 767 N.E.2d 42, 46 (2002); *Weeks v. Slavik Builders, Inc.*, 24 Mich.App. 621, 180 N.W.2d 503, 506 (1970); *Robertson Lumber Co. v. Stephen Farmers Coop. Elevator Co.*, 274 Minn. 17, 143 N.W.2d 622, 626 (1966); *Brown v. Elton Chalk, Inc.*, 358 So.2d 721, 722 (Miss.1978); *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795, 801 (Mo.1972); *Chandler v. Madsen*, 197 Mont. 234, 642 P.2d 1028, 1031 (1982); *Henggeler v. Jindra*, 191 Neb. 317, 214 N.W.2d 925, 926 (1974); *Radaker v. Scott*, 109 Nev. 653, 855 P.2d 1037, 1042 (1993); *Norton v. Burleaud*, 115 N.H. 435, 342 A.2d 629, 630 (1975); *Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314, 325–26 (1965); *De Roche v.*

*Dame*, 75 A.D.2d 384, 386, 430 N.Y.S.2d 390, 392 (1980); *Hartley v. Ballou*, 286 N.C. 51, 209 S.E.2d 776, 783 (1974); *Mitchem v. Johnson*, 7 Ohio St.2d 66, 218 N.E.2d 594, 597 (1966); *Jeanguneat v. Jackie Hames Constr. Co.*, 576 P.2d 761, 764 (Okla.1978); *Yepsen v. Burgess*, 269 Or. 635, 525 P.2d 1019, 1022 (1974); *Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771, 777 (1972); *Padula v. J.J. Deb–Cin Homes, Inc.*, 111 R.I. 29, 298 A.2d 529, 531 (1973); *Rutledge v. Dodenhoff*, 254 S.C. 407, 175 S.E.2d 792, 795 (1970); *Waggoner v. Midw. Dev., Inc.*, 83 S.D. 57, 154 N.W.2d 803, 809 (1967); *Dixon v. Mountain City Constr. Co.*, 632 S.W.2d 538, 541–42 (Tenn.1982); *Humber v. Morton*, 426 S.W.2d 554, 561–62 (Tex. 1968); *Rothberg v. Olenik*, 128 Vt. 295, 262 A.2d 461, 467 (1970); *Seabright v. Nesselrodt*, 4 Va. Cir. 322, 323 (Va.Cir.Ct.1985); *House v. Thornton*, 76 Wash.2d 428, 457 P.2d 199, 204 (1969); *Gamble v. Main*, 171 W.Va. 469, 300 S.E.2d 110, 114 (1983); *Shisler v. Frank*, No. 97–2310, 220 Wis.2d 357, 582 N.W.2d 504, 1998 WL 255206, *4–5, 1998 Wisc.App. LEXIS 1546 at *13–14 (Wisc.Ct.App. May 21, 1998); *Tavares v. Horstman*, 542 P.2d 1275, 1282 (Wyo.1975).

**9.** *See Council of Unit Owners of Breakwater House Condo.*, 603 A.2d at 793 (rejecting implied warranty of habitability because redundant of implied warranty of workmanlike manner that exists in new residential construction against developer); *Moglia v. McNeil Co.*, 270 Neb. 241, 700 N.W.2d 608, 616–17 (2005) (applying implied warranty of workmanlike performance to subsequent purchasers but refusing to do the same with implied warranty of habitability because "Nebraska has not adopted a cause of action based on implied warranty of habitability"); *Mitchem*, 218 N.E.2d at 597 (recognizing an implied warranty for workmanlike manner, but not for suitability).

**10.** *See Newcum v. Lawson*, 101 N.M. 448, 684 P.2d 534, 541 (Ct.App.1984) (avoiding the question because the contract disclaimed any warranties); *Barnes v. Mitzel Builders, Inc.*, 526 N.W.2d 244, 246 n. 1 (N.D.1995) (noting that issue was withdrawn from appeal, but that "[i]n a proper case, an implied warranty of fitness may apply to the construction of a residential home.").

states, Georgia and Utah, have expressly rejected implied warranties.[11] But Georgia does so because it allows recovery under negligence theory.[12] This leaves Utah in a minority of one.

¶ 53 Although the implied warranties adopted by courts "are known by various names such as 'habitability,' 'quality,' 'workmanship,' or 'fitness,'" 12 Thompson on Real Property § 99.06(a)(2)(A) (David A. Thomas ed., 2d Thomas ed.2008), courts rely on similar reasons and public policy considerations in adopting the warranties. Courts recognize that "[b]uilding construction by modern methods is complex and intertwined with governmental codes and regulations." *Tavares v. Horstman*, 542 P.2d 1275, 1279 (Wyo.1975). For a builder-vendor or developer-vendor engaged in the business of selling houses, the construction and/or sale of a new home is a daily event, whereas for a buyer the purchase of a new home is a significant and unique transaction. *See Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698, 710 (1966) ("The purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime. To apply the rule of caveat emptor to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice."). Given these modern realities and this disparity, "[a] home buyer should be able to place reliance on the builder or developer who sells him a new house." *Tavares*, 542 P.2d at 1279. Some courts reason that the implied warranty will "inhibit the unscrupulous, fly-by-night, or unskilled builder and ... discourage much of the sloppy work and jerry building that has become perceptible over the years." *Capra v. Smith*, 372 So.2d 321, 323 (Ala.1979) (internal quotation marks omitted). An implied warranty also takes into account the equitable consideration that between two innocent parties, the one in the better position to prevent the harm ought to

bear the loss. *See Chandler v. Madsen*, 197 Mont. 234, 642 P.2d 1028, 1031 (1982). While a builder-vendor certainly has "the opportunity to notice, avoid, or correct [latent defects] during the construction process," *Albrecht v. Clifford*, 436 Mass. 706, 767 N.E.2d 42, 46 (2002), a similar opportunity exists for the developer-vendor. As one court reasoned:

> Purchasers from a developer-seller depend on his ability to hire a contractor capable of building a home of sound structure. The buyers ... had no control over [the developer-seller's] choice of a builder. [The developer-seller] stood in the best position to know which contractor could perform the work adequately. The dependent relationship here between the buyers and [the developer-seller] is the same as if [it] was a builder-seller.

*Tassan v. United Dev. Co.*, 88 Ill.App.3d 581, 43 Ill.Dec. 769, 410 N.E.2d 902, 908 (1980). Hence, in protecting the innocent home purchaser by holding the responsible party accountable, the law has come to recognize that no longer does the purchaser of a new residence stand on an equal bargaining position with the builder-vendor or developer-vendor.

¶ 54 Moreover, the concept of an implied warranty is "consistent with the expectations of the parties." *Sloat v. Matheny*, 625 P.2d 1031, 1033 (Colo.1981). "[T]he essence of the transaction is an implicit engagement upon the part of the seller to transfer a house suitable for habitation." *Yepsen v. Burgess*, 269 Or. 635, 525 P.2d 1019, 1022 (1974). If the purchaser expected anything less, there would be no sale. *See Sloat*, 625 P.2d at 1033. The creation of an implied warranty, therefore, causes "no more uncertainty or chaos than the warranties commonly applied in sales of personal property." *Bethlahmy*, 415 P.2d at 707. Also, we are not convinced that an express written warranty provides sufficient protection where concerns regarding latent defects exist. "A buyer who has no knowledge, notice, or warning of defects,

---

**11.** *See Holmes v. Worthey*, 159 Ga.App. 262, 282 S.E.2d 919, 926 (1981); *Am. Towers*, 930 P.2d at 1193.

**12.** *Holmes*, 282 S.E.2d at 926 ("[W]e hold that while the buyer of a dwelling in this state pres-

ently may have no action under implied warranty, he does have a cause of action in negligence against a builder or a builder-seller for defective construction....").

is in no position to exact specific warranties. Any written warranty demanded in such a case would necessarily be so general in terms as to be difficult to enforce." *Id.*

■ ¶ 55 These sound reasons and policy considerations "lead[ ] logically to the buyer's expectation that he be judicially protected." *Tavares,* 542 P.2d at 1279. Although we rejected an implied warranty in *American Towers,* we agree with the following statement.

The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times. Ancient distinctions which make no sense in today's society and tend to discredit the law should be readily rejected. . . .

*Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314, 325 (1965). Recognizing that *American Towers* no longer represents what is right and just as to implied warranties in the purchase of a new residence, we now join the overwhelming majority of states. Under Utah law, in every contract for the sale of a new residence, a vendor in the business of building or selling such residences makes an implied warranty to the vendee that the residence is constructed in a workmanlike manner and fit for habitation.

■ ¶ 56 We recognize that "[t]he expansion of implied warranties has resulted in a blurring of the 'distinction, if any, between an implied warranty of habitability and an implied warranty of good quality and workmanship . . . in decisional law throughout the country.'" *Albrecht,* 767 N.E.2d at 45 n. 7 (omission in original)(quoting *Council of Unit Owners of Breakwater House Condo. v. Simpler,* 603 A.2d 792, 795 (Del.1992)). Some courts define the implied warranty of workmanlike manner as " 'the quality of work that would be done by a worker of average skill

and intelligence.' " *Id.* (quoting *Nastri v. Wood Bros. Homes, Inc.,* 142 Ariz. 439, 690 P.2d 158, 163 (Ct.App.1984)). Other courts define the implied warranty of habitability in the sense that if a new residence does not keep out the elements because of a defect of construction, such a residence is not habitable or that the new residence must "provide inhabitants with [a] reasonably safe place to live, without fear of injury to person, health, safety, or property." *Id.* (citing *Goggin v. Fox Valley Constr. Corp.,* 48 Ill.App.3d 103, 8 Ill.Dec. 271, 365 N.E.2d 509, 511 (1977)). In Utah, the scope of the implied warranty should be construed broadly to comport with the public policy considerations.

■ ¶ 57 The implied warranty we recognize today arises under contract law. While courts are divided as to whether an implied warranty arises under tort or contract law, *see Lempke v. Dagenais,* 130 N.H. 782, 547 A.2d 290, 292 (1988), given our adherence to the economic loss rule and its resulting division between tort and contract law, the implied warranty we adopt must be based in contract. Privity of contract is required to bring a claim for breach of the implied warranty.[13]

■ ¶ 58 We note that this implied warranty is "independent and collateral to the covenant to convey" and thus survives the effect of merger. *Albrecht,* 767 N.E.2d at 47; *see also Petersen v. Hubschman Constr. Co.,* 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154, 1158 (1979) ("The implied warranty does not arise as a result of the execution of the deed. It arises by virtue of the execution of the agreement between the vendor and the vendee. If that agreement would have contained express covenants concerning the quality of construction they would not have merged in the deed, but would have continued as a collateral undertaking."). Nor can the implied warranty "be

13. The requirement for privity of contract accords with section 78B–4–513 of the Utah Code, which states, "[a]n action for defective design or construction may be brought only by a person in privity of contract." Utah Code Ann. § 78B–4–513(4) (2008). Section 78B–4–513 further states, "Nothing in this section precludes a person from assigning a right under a contract to another person, including to a subsequent owner or a homeowners association." *Id.* § 78B–4–513(6). We also note that our adoption of an implied warranty further comports with section 78B–4–513 given that the statute limits "an action for defective design or construction . . . to breach of contract, whether written or otherwise, including both express and *implied* warranties." *Id.* § 78B–4–513(1) (emphasis added).

waived or disclaimed, because to permit the disclaimer of a warranty protecting a purchaser from the consequences of latent defects would defeat the very purpose of the warranty." *Albrecht*, 767 N.E.2d at 47.

¶ 59 The implied warranty, however, does not require perfection on the part of the builder-vendor/developer-vendor or "make them an insurer against any and all defects in a home." *Id.* "No house is built without defects," *Bethlahmy*, 415 P.2d at 711, and the implied warranty does not "protect against mere defects in workmanship, minor or procedural violations of the applicable building codes, or defects that are trivial or aesthetic." *Albrecht*, 767 N.E.2d at 47. Nor is the implied warranty intended to alleviate purchasers of their due diligence and opportunity to inspect a residential construction or the incentive to negotiate for express warranties.

¶ 60 Therefore, to establish a breach of the implied warranty of workmanlike manner or habitability under Utah law a plaintiff must show (1) the purchase of a new residence from a defendant builder-vendor/developer-vendor; (2) the residence contained a latent defect; (3) the defect manifested itself after purchase; (4) the defect was caused by improper design, material, or workmanship; and (5) the defect created a question of safety or made the house unfit for human habitation. *See id.*

¶ 61 The implied warranty is not infinite. A claim for breach of the implied warranty must be brought in accordance with Utah Code section 78B–2–225. That section imposes periods of limitation and repose for "all causes of action by or against a provider arising out of or related to the design, construction, or installation of an improvement." Utah Code Ann. § 78B–2–225(2)(e)(2008). "An action by or against a provider based in contract or warranty shall be commenced within six years of the date of completion of the improvement or abandonment of construction." *Id.* § 78B–2–225(3)(a).

¶ 62 Finally, we emphasize that this implied warranty does not abrogate the doctrine of caveat emptor in the sale of existing

or used residences. *See Utah State Med. Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643, 645 (Utah 1982) ("The doctrine [of caveat emptor] has eroded in the sale of new residential housing. However, the doctrine appears to prevail in the sale of used property whether homes or commercial.").

¶ 63 We now turn to the Association's claim for breach of the implied warranty. We hold that because Utah now recognizes the implied warranty of workmanlike manner and habitability, the district court erred in dismissing the Association's claim for breach of the implied warranty. On remand the Association may bring its claim for breach of the implied warranty, but it must show privity of contract with the Developer. We do not address whether privity of contract exists, because the issue is not before us and claims of breach of contract for a third-party beneficiary and equitable subrogation are pending before the district court. It is also unclear whether the original unit owners assigned their rights under their respective contracts with the Developer to the Association.[14] Similarly, the Complaint does not specify the dates necessary to determine whether the claim for breach of implied warranty was brought in accordance with the statute of limitations and repose under Utah Code section 78B–2–225. Accordingly, because Utah now recognizes an implied warranty of workmanlike manner and habitability, we reverse the district court's dismissal of the Association's claim.

## III. THE DISTRICT COURT MISAPPLIED THE COLLATERAL RIGHTS EXCEPTION OF THE MERGER DOCTRINE TO DISMISS THE CONTRACT AND EXPRESS WARRANTY CLAIMS

¶ 64 Applying the merger doctrine, the district court dismissed the Association's claims for breach of contract and breach of express warranty. The district court found that because the Association had not alleged that the seller was to perform some act after the delivery of the deed, the contract and

14. *See* Utah Code Ann. § 78B–4–513(6).

express warranty claims were not collateral to the delivery of the deed and thus had merged. This was error; the district court failed to consider whether the contract and express warranty claims were collateral to conveyance of the title, and it improperly deemed the absence of an act performed after the delivery of the deed to be conclusive evidence of intent.

¶ 65 "The doctrine of merger … is applicable when the acts to be performed by the seller in a contract relate only to the delivery of title to the buyer." *Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977). "[O]n delivery and acceptance of a deed the provisions of the underlying contract for the conveyance are deemed extinguished or superseded by the deed. Thus, the underlying contract merges into the deed." *Secor v. Knight*, 716 P.2d 790, 792 (Utah 1986).

¶ 66 However, collateral acts to the conveyance of title by the seller "survive the deed and are not extinguished by it." *Stubbs*, 567 P.2d at 169. Our case law looks to two factors to determine the collateral nature of an act: (1) whether the act "involve[s] a different subject matter *or* is collateral to the conveyance [of title]"; and (2) if the question of the collateral nature remains, whether the parties intended the act to be collateral. *Secor*, 716 P.2d at 793 (emphasis added). We address each factor in turn.

A. *Contract and Warranty Claims Regarding the Quality of Construction Are Collateral to the Conveyance of Title*

¶ 67 As to the first factor, we have applied the collateral rights exception where the act is distinct from the subject matter of the deed. *See Spears v. Warr*, 2002 UT 24, ¶ 16, 44 P.3d 742 (finding collateral rights exception applied where water rights were "not necessarily appurtenant to the [sale of two parcels of real property] but [were] separate rights, distinct from the subject matter of the deed"). But we have refused to apply the exception where the subject matter of the deed and the contract were the same or where the contract terms related to the title conveyed. *See Dansie v. Hi–Country Estates Homeowners Ass'n*, 1999 UT 62, ¶ 21, 987 P.2d 30 (finding that contract terms requiring membership in a homeowners' association were covenants related to title and encumbrance upon the title and thus related to the same subject matter as the deed); *Secor*, 716 P.2d at 793 (determining that a contract term regarding a basement apartment merged since it related to title that contained a restrictive covenant of a single-family dwelling).

¶ 68 Here, the district court failed to consider whether the contract and express warranty claims involved a different subject matter or were collateral to the conveyance of title. The Defendants argue that the deeds covered the same subject matter as the antecedent agreements because the deeds conveyed an ownership interest in a unit rather than a parcel of property with an edifice constructed upon it. But while the deeds and the antecedent agreements may, at their broadest, involve the same subject matter, the warranty and contract claims nonetheless qualify for the exception.

¶ 69 Contract terms and warranties regarding the quality of construction are not necessary for conveyance of the title nor do they address the quality of the title, encumber the title, or create covenants relating to the title. Consequently, "[c]ovenants of warranty as to quality and improvements are collateral to the conveyance and are not merged into nor satisfied by the deed." 11 Thompson on Real Property § 96.11(e) (David A. Thomas ed., 2d Thomas ed.2002)

¶ 70 The Association claims the Developer warranted that the project (1) complied with the building code and had been inspected for such; (2) consisted of high-quality structures; (3) was in good condition and properly and fully maintained; (4) had no faulty workmanship; (5) had no water intrusion, moisture problems, or other material defects; and that (6) the Association's budget and the monthly assessments were accurate and adequate for future maintenance, repair, and replacement.

¶ 71 The first five warranties are collateral because they relate to the quality of construction and are thus independent and distinct from the conveyance of title. Indeed,

such claims, as Defendants themselves pointed out below, "do not relate in any way to the five warranties that would make up a breach of warranty deed claim." Rather, the Association's contract and express warranty claims go to the quality of construction. Consequently, the contract and express warranty claims regarding the quality of construction are collateral and survive the deed. However, because the warranty regarding the Association's budget and the monthly assessments do not directly relate to the quality of construction, we address the second factor.

### B. The Absence of an Act After the Delivery of the Deed Is Not Conclusive Evidence of the Parties' Intent

¶ 72 Under the second factor, the intent of the parties is considered only when there is a "question of whether a specific term is or is not collateral." *Secor,* 716 P.2d at 793. "Whether the terms of the contract are collateral ... depends to a great extent on the intent of the parties with respect thereto." *Stubbs,* 567 P.2d at 169. In discussing the parties' intent, this court has stated,

> When [the] seller's performance is intended by the parties to take place at some time after the delivery of the deed it cannot be said that it was contemplated by the parties that delivery of the deed would constitute full performance on the part of the seller, absent some manifest intent to the contrary.

*Id.* at 169–70

¶ 73 The district court, however, misinterpreted this statement to mean that for an act to be collateral the seller must perform some act after the delivery of the deed. This is incorrect. An act performed after the delivery of the deed can, by itself, show the parties intended the contract terms to be collateral. *See Stubbs,* 567 P.2d at 170 (finding contract terms that allowed act after delivery of the deed made the terms collater-

al). Timing is but one consideration in determining the intent of the parties, however. The absence of an act after delivery does not determine conclusively the parties' intent that the act is not collateral. Rather, if the question of the collateral nature of an act remains after consideration of the first factor, the court should consider all evidence of the parties' intent. This may include whether the seller was to perform an act after the delivery of the deed, but that need not be the only evidence. The intent of the parties involves a question of fact and should be dealt with accordingly.

¶ 74 The district court therefore erred by failing to consider whether the contract and express warranty claims were collateral to the conveyance of title, and by determining that the acts were not collateral absent the allegation that Defendants were to perform some act after the delivery of the deed. We thus reverse the district court's dismissal of the Association's contract and express warranty claims.[15] On remand, whether the warranty regarding the Association's budget and the monthly assessments is a collateral act depends on the intent of the parties.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING THE ASSOCIATION'S MOTION TO AMEND THE COMPLAINT AND REINSTATE DISMISSED CLAIMS

¶ 75 Lastly, the Association argues that the district court abused its discretion in denying the Association's Motion to Amend the Complaint and Reinstate Dismissed Claims to include allegations of soil subsidence problems and reinstate the dismissed tort claims. The Association based its motion on the then recently published cases of *Yazd v. Woodside Homes Corp.,* 2006 UT 47, 143 P.3d 283; *Smith v. Frandsen,* 2004 UT 55, 94 P.3d 919; and *Moore v. Smith,* 2007 UT App 101, 158 P.3d 562.

¶ 76 After reviewing the Defendants' original motion to dismiss in light of *Smith, Yazd,* and *Moore,* the district court held that the

---

15. The Association also asks us to address whether the real estate purchase contracts are inseverable from the recorded CC & Rs and its obligations and privileges that run with the land. Our review of the record indicates that this issue was not presented to or ruled on by the district court in the context of the merger doctrine. Instead, the Association presented this argument in the context of its third-party beneficiary claim. We decline to address this argument on an issue that is still pending before the district court.

Association's reliance on these cases was misplaced, and it denied the Association's motion. As in its order granting, in part, the Defendant's Motion to Dismiss Complaint, the district court concluded that even with amended allegations of soil subsidence, the Association's tort claims remained barred by the economic loss rule because no independent duty existed.

¶ 77 However, as discussed above, the limited fiduciary duty owed by the Developer and Woolstenhulme constitutes an independent duty under which the Association may bring its negligence and negligent misrepresentation claims. Because the district court relied on an erroneous conclusion of law in denying the motion, it abused its discretion. *See Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957. The district court should have granted the Association's motion as to these two claims against the Developer and Woolstenhulme and the allegations regarding soil subsidence insofar as they relate to these two claims.

## CONCLUSION

¶ 78 We hold that the district court correctly applied the economic loss rule to dismiss the claims of negligence per se and nuisance against Defendants and the claim of negligence against the Builder. However, the district court improperly dismissed the Association's claims of negligence and negligent misrepresentation against the Developer and Woolstenhulme because they owed an independent duty to the Association during their period of control of the Townhome Owners' Association. We also hold that the dismissal of the implied warranty claim must be reversed because Utah now recognizes an implied warranty of workmanlike manner and habitability. Further, we hold that the

district court erred by dismissing the breach of contract and express warranty claims because warranties related to the quality of construction are collateral to the conveyance of title, and the absence of an act after delivery of the deed is not conclusive evidence of the parties' intent. Finally, we hold that the district court erred in denying the Motion to Amend the Complaint and Reinstate Dismissed Claims because it failed to recognize the duty owed by the Developer and Woolstenhulme to the Association. Accordingly, we affirm in part and reverse in part the orders of the district court and remand for proceedings consistent with this opinion.[16]

¶ 79 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.

---

16. We note that our decision today, in particular the adoption of the implied warranty, carries with it the ordinary effect of retroactive and prospective application. *See Malan v. Lewis*, 693 P.2d 661, 676 (Utah 1984) ("The general rule . . . is that the ruling of a court is deemed to state the true nature of the law both retrospectively and prospectively."). Exercising our discretion on this question, we conclude that given the nature, fairness, and limitations of the implied warranty, no substantial burden results. *See State Farm Mut. Ins. Co. v. Farmers Ins. Exch.*, 27 Utah 2d 166, 493 P.2d 1002, 1003 (1972). Nor does this

court's historical exclusion of implied warranties upset the reliance on prior judicial decisions because entering into contracts for the purchase of a new residence has always been done with the implied purpose that the residence, at a minimum, be habitable and built in a workmanlike manner. *Cf. Loyal Order of Moose v. County Bd. of Equalization*, 657 P.2d 257, 265 (Utah 1982)(applying change in law prospectively because organizations had relied upon prior law for tax exemptions and retroactive application would result in an unreasonable burden of back taxes).