**2019 UT App 112**

## THE UTAH COURT OF APPEALS

KIM HAYES AND NANCY HAYES,
Appellants,
*v.*
INTERMOUNTAIN GEOENVIRONMENTAL SERVICES INC.,
Appellee.

Opinion
No. 20180972-CA
Filed June 27, 2019

Second District Court, Farmington Department
The Honorable Glen R. Dawson
No. 170700693

Damian C. Smith, Attorney for Appellants

Anna Nelson, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES KATE APPLEBY and DIANA HAGEN concurred.

HARRIS, Judge:

¶1 A little more than a year after they built their "dream home," Kim and Nancy Hayes (Plaintiffs) began to notice cracks in the house's foundation and walls, and soon learned that the soil beneath the house was unstable. More than a decade earlier, Intermountain GeoEnvironmental Services Inc. (IGES) had, at the request of a developer (Developer), authored a geotechnical report concluding that residential construction could occur on the site provided certain precautions were taken. After learning that their house was built on unstable soil, Plaintiffs filed suit against IGES, asserting various negligence-based tort claims. The district court dismissed those claims, concluding that they were barred by the economic loss rule. Plaintiffs appeal that decision, and we affirm.

BACKGROUND[1]

¶2   In 2004, Developer hired IGES to conduct a geotechnical investigation and prepare a slope stability report for a subdivision it wanted to develop within the city limits of Layton, Utah. Layton City required that such a report be generated prior to construction of any houses on hillside lots. The lot upon which Plaintiffs eventually built their house was within the subdivision in question. After its investigation, IGES determined that construction could occur within the subdivision, provided that certain precautions were taken, ultimately concluding that "slope stability is satisfactory and the site is suitable for the proposed construction in accordance with the recommendations contained in this report."

¶3   Developer sold some of the subdivision lots to a third party, who in turn sold one to Plaintiffs. In 2015, Plaintiffs hired a general contractor (Contractor) to build a house on the lot, and Contractor completed construction that same year. The record on appeal contains little information about who designed the house and drew the architectural plans that governed construction, and does not reveal whether and to what extent that designer (in designing the house) or Contractor (in building it) relied on IGES's conclusions.[2]

---

1. Because this case comes to us on appeal from an order granting a motion to dismiss, we recite the facts as alleged in Plaintiffs' complaint, and we assume their truth for the purposes of our analysis. *See Torgerson v. Talbot*, 2017 UT App 231, ¶ 7, 414 P.3d 504 ("In reviewing a district court's grant of a motion to dismiss for failure to state a claim upon which relief can be granted, we accept all facts alleged as true, and indulge all reasonable inferences in favor of the non-moving party." (quotation simplified)).

2. The record contains a copy of the building permit for Plaintiffs' house, and that document lists a firm under the

(continued…)

¶4 About fourteen months after construction of the house was completed, Plaintiffs observed cracks in its foundation and walls. Plaintiffs then hired a different engineering firm to conduct another geotechnical study of the property. This study noted that the house was "experiencing excessive foundation settling," that "some lateral movement of the foundation elements has been observed," and that the movement was "believed to be the result of instability in the slope immediately below and to the east of the home." The report concluded that "the existing slope at the site fails to meet the minimum factors of safety" and, among other measures, recommended installing additional support for the foundation of the house, which would "likely need to extend at least 65 feet below existing foundation elements." Plaintiffs contacted several contractors to ask them to undertake the work, but none was willing to do so because of liability concerns. Unable to stabilize the structure, Plaintiffs continued to observe widening cracks in the foundation and walls of the house, and eventually concluded that the house was not safe to live in and was unsalable on the real estate market.

¶5 Plaintiffs then filed their lawsuit, suing IGES, Developer, and Contractor.[3] Against IGES, Plaintiffs brought tort claims for negligence, negligent misrepresentation, and negligent infliction of emotional distress (NIED), as well as a breach of contract claim in which Plaintiffs claimed to be third-party

---

(…continued)
heading "Architect or Engineer," but this is the only mention of that firm or its involvement in the project. Plaintiffs did not include that firm in their complaint, and do not mention the firm in their briefs on appeal.

3. Plaintiffs sued Developer for negligence and negligent misrepresentation. Plaintiffs sued Contractor for breach of the implied warranty of habitability. Plaintiffs' claims against Developer and Contractor are not at issue in this appeal.

beneficiaries of the 2004 contract between IGES and Developer. Plaintiffs sought to recover damages stemming from the damage to their house, the diminution in value of their land, and moving expenses. IGES moved, pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, to dismiss all of Plaintiffs' claims against it, arguing that the tort claims were barred under both the statutory and common law version of Utah's economic loss rule, and that Plaintiffs were not third-party beneficiaries of any contract with IGES. The district court granted IGES's motion, concluding that the economic loss rule applied to bar all of Plaintiffs' tort claims, and that Plaintiffs were not third-party beneficiaries of any contract between IGES and Developer.[4]

ISSUE AND STANDARD OF REVIEW

¶6    Plaintiffs now appeal the district court's order, arguing that the court erred when it applied the economic loss rule to

---

4. Because this ruling only disposed of Plaintiffs' claims against IGES, and did not contain any rulings regarding Plaintiffs' claims against the other defendants, the ruling did not dispose of all matters between all litigants in the action below, and therefore was not "a final order or judgment that ends the controversy between the litigants." *See Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 10, 428 P.3d 1133 (quotation simplified). Accordingly, the ruling was not immediately appealable. *See id.* Plaintiffs attempted to obtain certification for appeal pursuant to rule 54(b) of the Utah Rules of Civil Procedure, but did so improperly, and on this basis we dismissed Plaintiffs' first appeal on jurisdictional grounds. *See Hayes v. Intermountain GeoEnvtl. Services, Inc.*, 2018 UT App 223, ¶¶ 4–5, 437 P.3d 650. Thereafter, Plaintiffs dismissed without prejudice their claims against the other defendants, thereby taking care of the final issues in the case at the district court level, and filed a new notice of appeal.

dismiss their tort claims.[5] "The decision to grant a motion to dismiss presents a question of law that we review for correctness." *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 12, 221 P.3d 234 (quotation simplified). When reviewing such an order, "we accept the material allegations in the complaint as true and interpret those facts and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff as the non-moving party." *Id.* (quotation simplified).

ANALYSIS

¶7     As originally articulated, the economic loss rule was solely "a judicially created doctrine" marking "the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 32, 28 P.3d 669. In general, "the economic loss rule prohibits tort claims for purely economic loss." *Gables at Sterling Village Homeowners Ass'n, Inc. v. Castlewood-Sterling Village I, LLC*, 2018 UT 04, ¶ 47, 417 P.3d 95.

¶8     Although it began as a common-law creation, the economic loss rule now exists in Utah in both statutory and common-law forms. The statutory version of the economic loss rule was enacted in 2008, and applies only to "action[s] for defective design or construction." *See* Utah Code Ann. § 78B-4-

---

5. Plaintiffs do not appeal the district court's dismissal of their contract-based claim against IGES, or the district court's subsidiary determination that they were not third-party beneficiaries of any contract between IGES and Developer.

513(1) (LexisNexis 2018).[6] The common-law version of the economic loss rule continues to apply in situations that are beyond the scope of the statute. *See, e.g.*, *KTM Health Care Inc. v. SG Nursing Home, LLC*, 2018 UT App 152, ¶¶ 69–79, 436 P.3d 151. (applying the economic loss rule outside the design or construction context). IGES argues that it is protected from Plaintiffs' tort claims under both the statutory and the common-law economic loss rule. We agree with IGES that the statutory economic loss rule bars Plaintiffs' tort claims against IGES, and therefore we need not consider the applicability of the common-law economic loss rule in this case.

¶9      Utah's statutory economic loss rule provides that "an action for defective design or construction is limited to breach of the contract," Utah Code Ann. § 78B-4-513(1), and that, in general, "an action for defective design or construction may be brought only by a person in privity of contract with the original contractor, architect, engineer, or the real estate developer," *id.* § 78B-4-513(4). The statute contains an exception, however, for "damage to other property." *Id.* § 78B-4-513(2). IGES contends that Plaintiffs' tort claims against it constitute "action[s] for defective design or construction," and are therefore barred by the statutory economic loss rule. Plaintiffs resist this characterization, and in addition assert that the "other property" exception applies in any event. We conclude that Plaintiffs' tort claims constitute actions for defective design and construction, as that term is used in the statute, and that the "other property" exception does not apply.

---

6. While a few cases issued after the passage of Utah Code section 78B-4-513 have addressed the economic loss rule in the construction context, *see, e.g.*, *Reighard v. Yates*, 2012 UT 45, 285 P.3d 1168; *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234, the disputes giving rise to those cases arose before enactment of the statute, and therefore the opinions in those cases relied largely on the common law and did not directly interpret the statute.

A

¶10　The first question presented is whether and to what extent Plaintiffs' tort claims constitute "an action for defective design or construction" as that term is used in the statutory codification of the economic loss rule. *See id.* § 78B-4-513(1). Under the statute, such actions are "limited to breach of the contract," and therefore cannot be brought in tort. *Id.* Thus, to the extent Plaintiffs' tort claims constitute an action for defective design or construction, those claims are barred.

¶11　The question presented is one of statutory interpretation. "When interpreting a statute, our objective is to give effect to the intent of the legislature in light of the purpose the act was meant to achieve." *State v. Hunt*, 2018 UT App 222, ¶ 17, 438 P.3d 1 (quotation simplified). "Because the best evidence of the legislature's intent is the plain language of the statute itself, we look first to the plain language of the statute." *GeoMetWatch Corp. v. Utah State Univ. Research Found.*, 2018 UT 50, ¶ 15, 428 P.3d 1064 (quotation simplified). Sometimes, "the statutory text may not be 'plain' when read in isolation," but it "may become so in light of its linguistic, structural, and statutory context." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465.

¶12　As an initial matter, we think it plain that the tort claims Plaintiffs filed against IGES constitute "an action." In this context, the word "action" means "[a] civil or criminal judicial proceeding." *See Action*, Black's Law Dictionary (10th ed. 2014); *see also id. Action at Law* (defining "action at law" as "[a] civil suit stating a legal cause of action and seeking only a legal remedy"); *cf.* Utah Code Ann. § 78B-2-101(1) (defining "action" in a statute-of-limitations context as including "counterclaims and cross-complaints and all other civil actions in which affirmative relief is sought"); *id.* § 78B-6-202(6) (defining "civil action" in an alternative-dispute-resolution context as "an action in which a party seeks monetary or equitable relief at common law or pursuant to statute"). By filing tort claims against IGES, Plaintiffs commenced an "action" against it, as that word is used in the statute.

¶13 The more interesting part of the inquiry—and the one upon which the parties spend their energies—is whether the "action" Plaintiffs filed against IGES is one "for defective design or construction." IGES asserts that it is, and points out that the gravamen of Plaintiffs' claim is that their "dream home" was built on unstable soil and has been rendered uninhabitable as a result of settling and cracking, and that, at root, such claims depend on Plaintiffs' ability to demonstrate that their house was poorly designed or constructed. Plaintiffs, by contrast, contend that their tort claims against IGES are not for defective design or construction, and point out that IGES's 2004 report was issued before any relevant structure—including their house—was designed or constructed. Specifically, Plaintiffs assert that IGES's report "was a professional opinion on a state of facts concerning a lot later purchased by Plaintiffs," and argue that "IGES is being sued because its opinion about the stability of the slope was wrong, not because it improperly designed a structure."

¶14 We find meaningful the statute's use of the word "for," and see its use as a signal that—in order to determine if an action is truly one seeking redress in connection with defective design or construction—we should pay close attention to the claimed cause of the specific damages sought in the action. The statute asks us to consider what the "action" is being brought "for." That is, the legal label placed on each cause of action is less important, in this context, than the underlying factual scenario giving rise to the general grievance being lodged. Thus, to answer the question presented, we must examine the relief sought by Plaintiffs against IGES, as well as Plaintiffs' basic underlying theory of causation.

¶15 Our examination of Plaintiffs' complaint reveals that they are seeking only monetary relief from IGES, and that the damages they seek fall into four categories. First, Plaintiffs identify a category of damages "measured by actual physical damage—and eventual total destruction—of" their house. Second, Plaintiffs identify a category of damages related to having to move out of the damaged house, including "costs involved in finding replacement housing [and] storage

expenses." Third, as part of their NIED claim, Plaintiffs seek damages for emotional distress associated with the "actual physical peril" of being in the "zone of danger" created by occupying a house they deem unsafe. Finally, Plaintiffs seek damages related to harm to their lot, pointing out that the land itself "is undergoing continuing sliding and destruction such that it is totally unsuitable for residential construction."

¶16    The first three of Plaintiffs' four categories of claimed damages clearly are aimed at seeking redress "for defective design or construction." Under Plaintiffs' own version of events, IGES's allegedly faulty slope stability recommendations led to Plaintiffs purchasing the lot, then constructing a house upon it, then to the house settling and cracking, and then to emotional distress and moving expenses. Indeed, the entire point of commissioning a geotechnical report in this case was to determine whether houses could safely be built in the proposed subdivision and, if so, what sort of foundation and support those houses would need. Even Plaintiffs' chosen geotechnical engineer, whose report is attached to their complaint, acknowledges that houses *can* be safely constructed on the property, as long as their foundations are bolstered by supports extending at least sixty-five feet below the surface. Buildings must be designed and constructed to fit the land upon which they are built, and when a house is built to specifications that are inappropriate for the site, that is ultimately a design and construction issue. A common-sense understanding of Plaintiffs' action is that they claim to have suffered damages arising from something that went wrong—a defect—in the design and construction of their house. Even if the architect or the builder did not cause this defect, it is nonetheless a defect in the design and construction of the house, and the action is one "for defective design or construction."

¶17    A closer look at the language and context of the statutory economic loss rule reinforces this common-sense approach. Plaintiffs resist the application of the statute to their case by arguing that IGES "did not act as a 'design professional' in this case" and that the report was not "design work," but rather, was

"a professional opinion about an existing state or condition." But Plaintiffs' argument does not match the statute's language or context.

¶18 Geotechnical engineering recommendations are an important first step in the design and construction process. *See, e.g.*, American Bar Ass'n, *The Construction Project* § 2.III.D Geotechnical Engineer (Marilyn Klinger & Marianne Susong eds., 2006) ("A geotechnical engineer is often an essential participant on the design team. . . . [T]he geotechnical engineer . . . provides recommendations for the design of the proposed structure's foundation and structural system. This information . . . is typically one of the starting points for the structural engineer."); Shannon J. Briglia & Michael C. Loulakis, *Geotechnical Risk Allocation on Design-Build Construction Projects*, J. Am. C. Constr. Law., at 4, Sept. 2017 ("[G]eotechnical engineers are retained by or on behalf of the owner to ascertain site conditions, which information the design team uses to develop its plans and specifications."); *see also Terracon Consultants W. Inc. v. Mandalay Resort Group*, 206 P.3d 81, 89 (Nev. 2009) (en banc) (considering geotechnical engineers to be design professionals for the purposes of the economic loss rule). Given these realities, geotechnical engineers are considered "design professionals" as that term is defined in another analogous section of the Utah Code. *See* Utah Code Ann. § 13-8-2(1)(c) (LexisNexis 2013) (defining "design professional" as "an architect, *engineer*, or land surveyor," including "any other person who, for a fee or other compensation, performs services similar to the services of an architect, *engineer*, or land surveyor in connection with the development of land" (emphasis added)). Although the statutory economic loss rule does not use the term "design professional," it certainly uses the word "design," *see* Utah Code Ann. § 78B-4-513(1) (2018), and in determining what the legislature meant through its use of that term, it is helpful to examine how it has defined similar terms in analogous contexts, *see, e.g.*, *Wasatch Crest Ins. Co. v. LWP Claims Adm'rs Corp.*, 2007 UT 32, ¶¶ 13–14, 158 P.3d 548 (looking to other sections of the Utah Code for guidance in defining the relevant term where

the term was not defined in the statute at issue); *Territorial Sav. & Loan Ass'n v. Baird*, 781 P.2d 452, 461 (Utah 1989) (same). By including engineers within the definition of "design professional" elsewhere in the Utah Code, the legislature appears to have recognized the reality that engineers are often integral members of a building's design team.[7]

¶19    Accordingly, the bulk of Plaintiffs' lawsuit against IGES can comfortably be categorized as "an action for defective design or construction." A lawsuit that seeks recovery from a design professional—including a geotechnical engineer—for the diminution in value of (or costs to repair) a structure that has settled or sustained damage as a result of subsidence will nearly always be properly categorized as a lawsuit seeking recovery for defective design or construction.[8] Therefore, to the extent

---

7. As discussed at oral argument, the architect hired to design a building sometimes subcontracts with a geotechnical engineer for the express purpose of obtaining advice for the design of the building's foundation. In such scenarios, the geotechnical engineer may work closely with the architect and may well be directly involved in the actual design of the building. But—assuming the architect actually relies upon the geotechnical engineer's recommendations—we see no principled reason to treat a geotechnical engineer who completed his or her work months before the building was designed any differently than an engineer who works closely with the architect on a specific set of plans and specifications. In each situation, the engineer's recommendations are an important part of the building's design, and any action against the engineer for damage to the building alleged to be caused by the engineer's faulty recommendations would constitute an action for defective design or construction.

8. We do not mean to suggest that every case involving building subsidence is automatically "an action for defective design or construction." For example, if the building is settling because the adjoining landowner dug a tunnel under it, and the plaintiff is

(continued…)

Plaintiffs seek damages related to the structure itself—including claims for diminution in its value, repair costs, moving expenses incurred for having to leave the structure, or emotional distress related to living in it—their claims constitute actions for defective design or construction, and are covered by Utah Code section 78B-4-513(1).

¶20    Plaintiffs' fourth category of damages—a claim for damage to the lot—presents a closer question. With regard to this category of damages, Plaintiffs' claims do not directly implicate any actual structure; instead, Plaintiffs seek recovery of damages to the land itself. Although it is not entirely clear, at this stage of the proceedings, what this claim is designed to encompass—after all, IGES did not create whatever slope stability issues might inhere in Plaintiffs' lot—Plaintiffs appear to be asserting that the value of their lot has diminished now that it is known that construction on the property will be problematic. Though Plaintiffs do not phrase it in exactly this way, they appear to be claiming that, when they purchased their lot, they did so in reliance on IGES's recommendations, and paid a price for the lot commensurate with it being readily buildable, and that the lot is no longer worth what they paid for it because of the slope stability issues that have since come to light.

¶21    Ultimately, however, we view this portion of the claim as one for defective design or construction also. As noted, IGES was originally hired to provide recommendations regarding what kind of structures could be built on the property. That is, its recommendations were to be used principally as guidance for

---

(…continued)

pointing the finger at the neighbor rather than at an architect, contractor, or geotechnical engineer, the case would arguably not be so categorized. But we are hard-pressed to imagine a building-subsidence case in which the plaintiff *is* pointing the finger at a contractor or design professional that would not be "an action for defective design or construction."

designers and builders of structures. This is not a case in which IGES's recommendations were to be used for, say, determining whether mining or grazing operations could usefully be conducted on the property. IGES's recommendations were always about *buildability*, which is ultimately a design and construction issue. Indeed, if we are construing Plaintiffs' claim correctly, the purported diminution in value of Plaintiffs' lot has to do with whether, and to what extent, the lot is buildable—that is, whether a prospective purchaser will be able to build a house on that lot and, if so, what kind of additional foundation requirements must be included in the structure's design in order to make construction feasible.

¶22 In the end, we conclude that each category of damages Plaintiffs seek from IGES is related to allegations of defective design or construction. Accordingly, Plaintiffs' tort claims constitute an "action for defective design or construction," and are therefore within the purview of Utah Code section 78B-4-513(1), which—subject to two exceptions, *see* Utah Code Ann. § 78B-4-513(2), one of which is discussed below—requires such claims to be brought, if at all, as contract claims.

B

¶23 The statutory economic loss rule provides an exception for claims seeking redress for "damage to other property," even if that damage is caused by "defective design or construction." *See id.* § 78B-4-513(2). Plaintiffs assert that this exception applies here, at least to their claims for damage to the house (as opposed to damage to the lot), which they attempt to characterize as "other property." We disagree.

¶24 Although the statutory codification of the economic loss rule does not provide a complete definition of the phrase "other property," it does provide helpful guidance as to the term's reach, specifying that the "other property" exception set forth in subsection (2) of the statute cannot apply to "the failure of construction to function as designed," or to the "diminution of

the value of the constructed property because of the defective design or construction." *Id.* § 78B-4-513(3). This language directly forecloses Plaintiffs' argument that the house constitutes "other property" not subject to the economic loss rule.

¶25 Moreover, the "other property" exception is also part of the common-law economic loss rule, and was incorporated into the codification of the statutory economic loss rule. *See, e.g., Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 25, 221 P.3d 234 (discussing the "other property" exception in the context of the common-law economic loss rule). Because the legislature, in codifying the economic loss rule, drew the term from the common law, we find it helpful to examine how courts employ that term in common law cases. In *Davencourt*, our supreme court held that individual components of the product bargained for cannot constitute "other property." *Id.* (holding that the condominiums at issue were purchased as a "finished product," and therefore the "individual components"—including the roof, the foundation, and the siding—were not "other property"); *see also American Towers Owners Ass'n v. CCI Mech., Inc.*, 930 P.2d 1182, 1191 (Utah 1996) (holding that "walls, wall coverings, carpeting, wall hangings, curtains, and other furnishings" were not "other property" because "the 'property' was the entire complex itself that was constructed as an integrated unit under one general contract"), *abrogated on other grounds by Davencourt at Pilgrims Landing Homeowners Ass'n*, 2009 UT 65.

¶26 Plaintiffs argue that, because they purchased the land and contracted for the building of the house in two separate transactions, the house constitutes "a separate property," distinct from the land, and should fall under the "other property" exception. Plaintiffs assert that IGES's recommendations applied "only to a plot of land," and reason that their house was a "separate improvement, apart from the land, that was separately bargained for and purchased." (Quotation simplified.) Plaintiffs compare their situation to one "where a defectively designed building collapses and destroys a building built on adjacent property."

¶27    But IGES's recommendations did not apply only to a plot of land, as Plaintiffs contend. The report was obtained by a developer to assess the suitability of that land for construction of houses. As discussed above, the entire point of the report was to provide input regarding the type of support any structures built on that land would need. Contrary to Plaintiffs' assertions, the condition of the land is inextricably bound to the construction of the house. For instance, Plaintiffs' house presumably could have been built—exactly as it was—and placed on a more stable piece of land without incident; likewise, even according to Plaintiffs' expert, the land could have supported a house built with a different foundation. The alleged defect in this case lies at the intersection of the house and the land; neither is defective without the other. Even though Plaintiffs purchased the lot before they contracted for the construction of the house, the house and the land upon which it is built constitute an inseparable "integrated unit" for all intents and purposes.

¶28    Accordingly, we conclude that the "other property" exception built into the statutory economic loss rule is inapplicable here.

CONCLUSION

¶29    By filing tort claims against IGES for faulty soils recommendations, Plaintiffs are attempting to blame IGES for damage to their house, moving expenses, and emotional distress, as well as diminution in value of their land. Given their nature, these are actions "for defective design or construction," as that term is used in the statutory version of the economic loss rule. Utah Code Ann. § 78B-4-513. Moreover, these are not claims for damage to "other property." As a result, Plaintiffs' tort claims against IGES are barred by the statutory economic loss rule.

¶30    Even though Plaintiffs may not bring tort claims against IGES, parties in Plaintiffs' shoes typically are not without a

remedy. The economic loss rule, as applied in the construction context, envisions a chain of contractual relationships, and generally requires that parties in such situations bring claims against the entities with whom they are in privity of contract. In Plaintiffs' case, that could have been the contractor who built their house, or the architect who designed it, or any other person or entity with whom they have a direct contractual relationship. There are also limited opportunities to bring other claims in these situations, including claims for breach of the warranty of habitability. *See Davencourt at Pilgrims Landing Owners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶¶ 49–63, 221 P.3d 234. Indeed, Plaintiffs brought some such claims in this case against Contractor and Developer. In this case, Plaintiffs are disappointed that Contractor apparently does not possess valid insurance coverage, a circumstance that is extremely unfortunate for Plaintiffs but—even if true—is not grounds for us to ignore the strictures of the economic loss rule, which bars the claims at issue in this appeal. *See Wasatch County v. Tax Comm'n*, 2009 UT App 221, ¶ 5 n.3, 217 P.3d 270 ("It is not within our province to read something into the statute not found there, nor to carve out exceptions to meet hard cases." (quotation simplified)).

¶31    Affirmed.

———————