**2021 UT 62**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

KIM HAYES and NANCY HAYES,
*Petitioners*,

*v.*

INTERMOUNTAIN GEOENVIRONMENTAL SERVICES, INC.,
*Respondent*.

No. 20190764
Heard November 13, 2020
Filed November 4, 2021

On Certiorari to the Utah Court of Appeals

Second District, Davis County
The Honorable Glen R. Dawson
No. 170700693

Attorneys:[1]

Damian C. Smith, Lehi, for petitioners

Anna Nelson, Salt Lake City, for respondent

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE PETERSEN, opinion of the Court:

### INTRODUCTION

¶1 Shortly after moving into their new home, Kim and Nancy Hayes noticed the walls and foundation were cracking.

---

[1] Attorney for *amicus curiae* Utah League of Cities and Towns: Cameron B. Diehl, Salt Lake City; attorneys for *amicus curiae* Layton City: Gary R. Crane, Steven L. Garside, and J. Mason Kjar, Layton; attorney for *amicus curiae* West Jordan City: Paul D. Dodd, West Jordan.

They discovered that this was caused by "failure surfaces" in the soil approximately sixty-five feet beneath their home. The Hayeses filed suit, asserting a variety of tort and contract claims against the contractor, the developer, and Respondent Intermountain GeoEnvironmental Services, Inc. (IGES)—a geotechnical engineering firm that provided a geotechnical report opining the site was safe for residential construction, provided certain recommendations were met.[2]

¶2    Each of the Hayeses' claims against IGES were tort claims asserting negligence. IGES moved to dismiss the claims, arguing they were barred by both the common law and statutory economic loss rules, which place limits on tort claims for purely economic losses. The district court agreed and dismissed the Hayeses' claims against IGES. And the court of appeals affirmed, holding that the claims were proscribed by Utah's statutory economic loss rule (Economic Loss Statute or Statute), which limits any "action for defective design or construction" to claims for breach of contract, with narrow exceptions. UTAH CODE § 78B-4-513(1) to (2). The court of appeals concluded that the Hayeses' negligence claims were subject to the Economic Loss Statute because they amounted to "an action for defective design or construction."

¶3    On certiorari, the question before us is whether the court of appeals correctly construed the Economic Loss Statute to reach the Hayeses' negligence claims. The Hayeses also argue that the court of appeals should have analyzed whether a common law independent duty exception applies to their claims.

¶4    Because we agree with the court of appeals that the Hayeses have brought an "action for defective design," the Economic Loss Statute applies and bars the Hayeses' negligence claims. Further, no common law exception is available because the Statute is controlling. We affirm.

_____

[2] Only the claims against IGES are before us. We note that the Hayeses and the other remaining defendants stipulated to a dismissal without prejudice to allow for this appeal.

**BACKGROUND**[3]

¶5 Kim and Nancy Hayes built a home in the Quail Hollow subdivision in Layton, Utah. The subdivision was developed by K.C. Halls Construction, Inc. Halls Construction acted as an agent for Roger Nuttal, who sold the building lot to the Hayeses. The Hayeses then hired Bob Stevenson to construct the house. About fourteen months after completion, the Hayeses noticed cracking in the home's walls and foundation.

¶6 More than ten years prior to construction of the residence, Halls Construction contracted with IGES to provide a geotechnical report for the planned development, as required by Layton City. IGES reviewed geological maps of the area; conducted a field investigation during which it completed three borings to depths of twenty-five, twenty-five, and fifty feet deep; and tested the resulting soil samples in a laboratory to "assess the soil's pertinent engineering properties." IGES prepared a geotechnical report for Halls Construction, in which it included the findings obtained from the drillings and concluded that "[b]ased on the subsurface conditions encountered at the site and slope stability analysis, it is our opinion that the subject site is suitable for the proposed construction provided that the recommendations contained in this report are complied with." The report made recommendations pertinent to future construction, including that: all structures be placed on structural fill, structures be founded on spread footings, the maximum allowable bearing pressure[4] be 2,000 pounds per square foot,

---

[3] With respect to a district court's grant of a motion to dismiss, "we accept the factual allegations in the complaint as true and consider them, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. . . . We recite the facts accordingly." *Christensen v. Utah State Tax Comm'n*, 2020 UT 45, n.1, 469 P.3d 962 (alteration in original) (citation omitted).

[4] The bearing capacity (or bearing pressure) is "the maximum stress or pressure that a footing can sustain without failure of the soil or rock that is supporting the footing." Jeffrey R. Keaton, *Bearing Capacity*, in ENCYCLOPEDIA OF ENG'G GEOLOGY (Peter T. Bobrowsky & Brian Marker eds., 2018), https://link.

(continued . . .)

concrete slabs be designed by a structural engineer, and subdrains be considered.

¶7    After the cracks manifested, the Hayeses hired a different engineering firm, CMT Engineering Laboratories, to conduct another geotechnical exploration. CMT found a subsurface problem that IGES had not, concluding: "[T]he existing slope at the site fails to meet the minimum factors of safety. Failure surfaces within the slope analysis model extend about [sixty-five] feet below the existing structure." The Hayeses attempted to hire a contractor to remediate the issue but were unable to find anyone to take on the project. According to the complaint, "no contractor was willing to submit a bid based on their inability to guarantee that the remedial actions would result in stabilization of the structure," and they were unwilling to assume liability for the work.

¶8    The Hayeses ultimately concluded that their property was unsafe and could not support their home. They filed a complaint against Halls Construction, Stevenson, and IGES. Relevant here, the Hayeses sued IGES for negligence, negligent misrepresentation for "wrongly concluding that the [lot] was safe and suitable for residential construction," and negligent infliction of emotional distress caused by "witnessing the continuing destruction of" their home.[5] The Hayeses' core allegation was that IGES's report had been wrong. They asserted that although IGES reported that the property was "safe and suitable" for residential construction, it "was not and is not suitable or safe for construction of a residence." They sought compensation for the damage and eventual destruction of their home, damage to the lot on which the home was built, moving expenses, and their emotional distress.

¶9    IGES moved to dismiss the Hayeses' complaint, arguing their negligence claims were barred by both the common law economic loss rule and the Economic Loss Statute because the

springer.com/referenceworkentry/10.1007%2F978-3-319-73568-9_27 (last visited Aug. 27, 2021).

[5] The Hayeses also asserted a breach of contract claim, asserting they were third party beneficiaries of the contract between IGES and Halls Construction. The district court dismissed this claim, and it is not before us.

Hayeses were seeking compensation in tort for purely economic losses. IGES noted that the common law economic loss rule recognizes an exception, permitting tort claims for economic losses when a defendant has a duty to the plaintiff independent of any contractual relationship. IGES argued that it had no independent duty to the Hayeses. But it asserted that even if it did, the Economic Loss Statute applies to the Hayeses' complaint, and because the Statute does not contain an independent duty exception, no exception would apply. The district court granted the motion and the Hayeses appealed.

¶10 The court of appeals affirmed. It held that the Hayeses' tort claims against IGES were subject to the Economic Loss Statute because, in substance, they constituted an "action for defective design or construction."[6] *Hayes v. Intermountain GeoEnvironmental Servs. Inc.*, 2019 UT App 112, ¶ 22, 446 P.3d 594. The court also concluded that because the Economic Loss Statute applied, it did not need to consider the applicability of the common law economic loss rule or its independent duty exception. *Id.* ¶ 8.

¶11 The Hayeses petitioned for certiorari, which we granted. We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶12 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Marquina*, 2020 UT 66, ¶ 24, 478 P.3d 37 (citation omitted).

## ANALYSIS

¶13 We granted certiorari to address whether the court of appeals erred in its interpretation and application of the Economic Loss Statute. The court of appeals held that the Hayeses' tort claims amounted to an "action[] for defective design and construction, as that term is used in the [S]tatute." *Hayes v. Intermountain GeoEnvironmental Servs. Inc.*, 2019 UT App 112, ¶ 9, 446 P.3d 594. To reach this conclusion, the court examined "the

---

[6] The court of appeals further held that the "other property" exception in the Economic Loss Statute did not apply. *Hayes v. Intermountain GeoEnvironmental Servs. Inc.*, 2019 UT App 112, ¶ 28, 446 P.3d 594. The Hayeses do not challenge that conclusion and it is not before us.

relief sought by Plaintiffs against IGES, as well as Plaintiffs' basic underlying theory of causation," rather than looking only at the "legal label" placed on each claim. *Id.* ¶ 14. And the court assessed the role of geotechnical engineers in design and construction, observing that "[g]eotechnical engineering recommendations are an important first step in the design and construction process," and that engineers are considered "design professionals" elsewhere in the Utah Code. *Id.* ¶ 18. The court ultimately concluded that

> A lawsuit that seeks recovery from a design professional—including a geotechnical engineer—for the diminution in value of (or costs to repair) a structure that has settled or sustained damage as a result of subsidence will nearly always be properly categorized as a lawsuit seeking recovery for defective design or construction.

*Id.* ¶ 19 (footnote omitted).

¶14 The Hayeses argue that the court of appeals erred in two respects. First, they contend their negligence claims should not be subject to the Economic Loss Statute because they are not alleging that IGES provided a "defective design." Rather, they characterize their claims as alleging only that IGES negligently missed the subsurface fracture sixty-five feet below their home and consequently issued the erroneous report. And they assert that "a geotechnical report on soil stability conditions" is not a "design." In the alternative, the Hayeses argue that the court of appeals should have considered whether IGES owed them an independent duty under the common law.

¶15 We conclude that the court of appeals correctly interpreted and applied the Statute. We first discuss the economic loss rule in general and then address the construction and application of the Economic Loss Statute.

## I. THE ECONOMIC LOSS RULE

¶16 In general, the economic loss rule places limits on tort claims for purely economic losses. *See* UTAH CODE § 78B-4-513(1); *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 2018 UT 04, ¶ 47, 417 P.3d 95. It is a "judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a

duty of reasonable care." *Gables at Sterling Vill.*, 2018 UT 04, ¶ 47 (citation omitted). In Utah, the rule appears in both the common law, *see HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶¶ 12–16, 435 P.3d 193 (discussing the common law rule), and in statutory law as codified in the Economic Loss Statute, UTAH CODE § 78B-4-513.

### *A. The Common Law Rule*

¶17   We first adopted the common law economic loss rule in *American Towers Owners Ass'n, Inc. v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1188–92 (Utah 1996), *abrogated on other grounds by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234. We discussed the interplay between contract claims and tort claims and stated, "contract principles resolve issues when the product does not meet the user's expectations, while tort principles resolve issues when the product is unsafe to person or property." *Id.* at 1190. We also emphasized that the policy reasons for the economic loss rule are "particularly applicable to claims of negligent construction." *Id.* We explained: "Construction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations. Contracting parties are free to adjust their respective obligations to satisfy their mutual expectations." *Id.* In adopting the rule, we held that allowing negligence actions in such circumstances would "impose [plaintiffs'] economic expectations upon parties whom the [plaintiffs] did not know and with whom they did not deal and upon contracts to which they were not a party." *Id.* at 1192.

¶18   However, we have recognized an exception to the general common law rule:

> [T]he initial inquiry in cases where the line between contract and tort blurs is whether a duty exists independent of any contractual obligations between the parties. When an independent duty exists, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.

*Hermansen v. Tasulis*, 2002 UT 52, ¶ 17, 48 P.3d 235 (citation omitted) (internal quotation marks omitted).

*B. The Statutory Rule*

¶19   In 2008, the legislature codified the economic loss rule with respect to actions "for defective design or construction." UTAH CODE § 78B-4-513(1). The Statute provides that:

> (1) . . . [A]n action for defective design or construction is limited to breach of the contract, whether written or otherwise, including both express and implied warranties.
>
> (2) An action for defective design or construction may include damage to other property or physical personal injury if the damage or injury is caused by the defective design or construction.
>
> . . . .
>
> (4) Except as provided in Subsection[] (2) . . ., an action for defective design or construction may be brought only by a person in privity of contract with the original contractor, architect, engineer, or the real estate developer.
>
> (5) If a person in privity of contract sues for defective design or construction under this section, nothing in this section precludes the person from bringing, in the same suit, another cause of action to which the person is entitled based on an intentional or willful breach of a duty existing in law.

*Id.* § 78B-4-513(1) to (2), (4) to (5).

## II. INTERPRETATION AND APPLICATION OF THE ECONOMIC LOSS STATUTE

¶20   We continue to apply the common law economic loss rule outside the context of defective design and construction claims. *See HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶¶ 12–16, 435 P.3d 193; *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 2018 UT 04, ¶¶ 47–54, 417 P.3d 95. However, any "action for defective design or construction" is subject to the Statute—meaning that it must be brought as a breach of contract claim rather than a tort claim unless a statutory exception applies.

¶21   The Hayeses argue that the court of appeals erred when it concluded their complaint was subject to the Statute because it constituted an action for defective design or construction. Neither

party contends that IGES engaged in construction, so the Hayeses focus on arguing that their complaint is not an action for "defective design" because IGES did not engage in "design." They reason that, while some geotechnical engineers may provide design services, that is not what IGES did here. Rather, they allege that IGES wrote a faulty report when it erroneously concluded their lot was safe and suitable for residential construction. And they argue that providing an opinion about subsurface conditions and slope stability does not constitute "design" under the Statute.

¶22 When interpreting statutory terms, our aim "is to ascertain the intent of the legislature." *In re Adoption of B.H.*, 2020 UT 64, ¶ 31, 474 P.3d 981 (citation omitted). To begin this inquiry, we look at the plain language of the statute. *Id.* Here, while the Statute speaks of "defective design," UTAH CODE § 78B-4-513(1), it does not define "design."

¶23 The Hayeses propose some dictionary definitions to interpret the meaning of design. They define design in its verb form as "to make or draw plans for something, for example clothes or buildings." *Design*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/design ?q=Design (last visited Aug. 27, 2021). And they define design in its noun form as "a drawing or set of drawings showing how a building or product should be made and how it will work and look." *Id.*

¶24 However, "while the ordinary meaning of a word is powerful evidence in understanding statutory text," we must also consider the meaning intended in the particular context of the statute. *State v. Rasabout*, 2015 UT 72, ¶ 10, 356 P.3d 1258. "Words and phrases are presumed to have been used according to their plain, natural, and common import and usage of the language, unless obviously used in a technical sense." *Parkinson v. State Bank of Millard Cnty.*, 35 P.2d 814, 821 (Utah 1934). In the latter instance, "where [the legislature] has used technical words [in a given statutory provision] . . ., it (is) proper to explain them by reference to the art or science to which they (are) appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (fourth and fifth alternations in original) (citation omitted) (internal quotation marks omitted).

¶25 Here, the Economic Loss Statute is situated in the construction context. *See* UTAH CODE § 78B-4-513 (addressing actions for defective design or construction). And IGES operates in the field of geotechnical engineering. So while the definitions

proposed by the Hayeses are somewhat helpful in discerning the parameters of the term "design," they do not tell us much about the meaning of the word in the realms of construction or engineering.

¶26  Since the Economic Loss Statute does not define design, we agree with the court of appeals that it is useful to consider "how [the legislature] has defined similar terms in analogous contexts." *Hayes v. Intermountain GeoEnvironmental Servs. Inc.*, 2019 UT App 112, ¶ 18, 446 P.3d 594 (citing *Wasatch Crest Ins. Co. v. LWP Claims Adm'rs Corp.*, 2007 UT 32, ¶¶ 13–14, 158 P.3d 548). The court of appeals correctly noted that in the Utah Code Title involving commerce and trade, the definition of "design professional" includes engineers. *See id.* (citing UTAH CODE § 13-8-2(1)(c)). Specifically, the statute states that "'[d]esign professional' means an architect, *engineer*, or land surveyor. It includes any other person who, for a fee or other compensation, performs services similar to the services of an architect, engineer, or land surveyor in connection with the development of land." UTAH CODE § 13-8-2(1)(c) (emphasis added).

¶27  The legislature provides another helpful definition in the statute establishing the statute of limitations for actions related to improvements in real property. *See id.* § 78B-2-225. The statute applies to any claim for "acts, errors, omissions, or breach of duty arising out of or related to the *design, construction*, or installation of an improvement." *Id.* § 78B-2-225(1)(b) (emphasis added). The persons who are protected by the statute of limitations—called "providers" in the statute—are defined as "any person . . . contributing to, providing, or performing . . . studies, plans, specifications, drawings, designs, value engineering, cost or quantity estimates, surveys, staking, construction, installation, or labor to an improvement." *Id.* § 78B-2-225(1)(f)(i)(A). The broad scope of this definition indicates that the legislature views the services that constitute design and construction (and here, installation) quite comprehensively. For example, while the definition of provider includes persons providing "drawings," it also includes those providing "studies." *Id.*

¶28  As IGES is a geotechnical engineering firm, we also find definitions of "design" within the field of engineering to be illuminating. The Accreditation Board for Engineering & Technology (ABET) defines "engineering design" as

> a process of devising a system, component, or
> process to meet desired needs and specifications

within constraints. It is an iterative, creative, decision-making process in which the basic sciences, mathematics, and engineering sciences are applied to convert resources into solutions. Engineering design involves identifying opportunities, developing requirements, performing analysis and synthesis, generating multiple solutions, evaluating solutions against requirements, considering risks, and making trade-offs, for the purpose of obtaining a high-quality solution under the given circumstances. For illustrative purposes only, examples of possible constraints include accessibility, aesthetics, codes, constructability, cost, ergonomics, extensibility, functionality, interoperability, legal considerations, maintainability, manufacturability, marketability, policy, regulations, schedule, standards, sustainability, or usability.

ACCREDITATION BD. FOR ENG'G & TECH., CRITERIA FOR ACCREDITING ENG'G PROGRAMS 4 (2019).[7] Under this definition, the concept of design contemplates much more than drawing plans.

¶29 We agree with the court of appeals' observation that "[a] geotechnical engineer is often an essential participant on the design team." *Hayes*, 2019 UT App 112, ¶ 18 (quoting ABA, THE CONSTR. PROJECT 47 (Marilyn Klinger & Marianne Susong eds., 2006)). In general,

The geotechnical engineer investigates the subsurface conditions at the project site before the structural engineer designs the structural foundation. The geotechnical engineer fulfills the essential role of determining the bearing capacities and stability of the soils present at the project site. This allows other members of the design team, who

---

[7] ABET accredits "college and university programs in . . . engineering . . . at the associate, bachelor's and master's degree levels." *About ABET*, ABET, https://www.abet.org/about-abet/ (last visited Aug. 27, 2021). Holding a degree from an ABET accredited engineering program is required for licensure as a professional engineer in Utah. UTAH ADMIN. CODE R. 156-22-302b.

typically design a building from the roof down, to determine the appropriate loads for the building. If a geotechnical engineer determines that the soils at the site are unstable or that inappropriate fill material is present on the site, such findings may ultimately weigh against continuation with the project on the selected site altogether. Although the owner can modify most sites to support a structure irrespective of the soil conditions, the expense required to do so may dictate against proceeding. . . .

The geotechnical engineer typically drills holes at various locations on the site and/or digs test pits to obtain information regarding the type of soil, water table, and locations of existing rock. After performing these tests, the geotechnical engineer prepares a report describing the findings obtained from the drillings and provides recommendations for the design of the proposed structure's foundation and structural system. This information provided by the geotechnical engineer is typically one of the starting points for the structural engineer. The owner may also ask the geotechnical engineer to stay involved in the project for purposes of inspecting footing base before the contractor pours footings and monitoring the subsequent pour of the footings.

ABA, THE CONSTR. PROJECT 47 (Marilyn Klinger & Marianne Susong eds., 2006).

¶30  Further, the geotechnical report is an integral part of the structural design of a building's foundation. A building's design team pulls site-specific soil information from the geotechnical report, including the bearing capacity, to design the foundation. *See* Jess Lohse, *The Structural Design Process of a Building*, SBC MAG. (June 10, 2019), https://www.sbcmag.info/news/2019/jun/structural-design-process-building (last visited Aug. 27, 2021). The bearing capacity (or bearing pressure) is "the maximum stress or pressure that a footing can sustain without failure of the soil or rock that is supporting the footing." Jeffrey R. Keaton, *Bearing Capacity*, *in* ENCYCLOPEDIA OF ENG'G GEOLOGY (Peter T. Bobrowsky & Brian Marker eds., 2018), https://link.springer.com/ referenceworkentry/10.1007%2F978-3-319-73568-9_27 (last visited Aug. 27, 2021). Accurately mapping

out weight distribution and other forces that may be applied to the structure is imperative. *Id.*

¶31 This is the role that IGES and their geotechnical report played here. We take as true the Hayeses' allegation that the walls and foundation of their home cracked because of the subsurface instability that IGES failed to identify. Thus, the home's structural design was insufficient for the site-specific soil conditions because the design did not accurately account for the subsurface instability. This omission, according to CMT, led to the movement and cracking of the home.

¶32 This illustrates how the type of information contained in IGES's geotechnical report is an integral part of a building's design. The bearing pressure provided by IGES was a design constraint within which a design team would have had to work. Site-specific subsurface conditions, soil, and slope stability information are integral to designing a home's foundation.

¶33 We conclude that it is impossible to separate the information and opinions in the geotechnical report from the design of the home. The geotechnical report is a necessary component of the structural design of a home and is thus integral to the design itself. Accordingly, we agree with the court of appeals that the Hayeses' allegation that the report was erroneous is, in substance, a claim for defective design. And the Hayeses' negligence claims against IGES are therefore subject to the Economic Loss Statute.

### III. INDEPENDENT DUTY

¶34 Next, the Hayeses argue that the court of appeals erred by not considering whether IGES owed them an independent duty. As explained above, under the common law economic loss rule, an exception exists to permit a tort claim when the defendant owes the plaintiff a duty independent of any contractual relationship between the parties. *See supra* ¶ 19.

¶35 However, in the context of actions for "defective design or construction," such as here, the Economic Loss Statute controls. *See* UTAH CODE § 78B-4-513. Whether an exception is available here is a matter of applying the Statute, not the common law. *See Gilger v. Hernandez*, 2000 UT 23, ¶¶ 9–13, 997 P.2d 305 (holding that when statutory law is intended to occupy the field it supersedes common law doctrines).

¶36 Looking to the language of the Statute, unless an action includes damage to "other property or physical personal injury,"

which is not the case here, the only exception permitted by the legislature appears in subsection five. It permits a person in privity of contract who sues for breach of contract under the Statute to include other claims "to which the person is entitled based on an intentional or willful breach of a duty existing in law." UTAH CODE § 78B-4-513(5). This exception does not apply to the Hayeses' claim against IGES, because they are not in privity of contract.

¶37 We in no way intend to diminish the hardship the Hayeses have suffered from the destruction of their home. We also appreciate the policy arguments that Layton City, as amicus, has raised in urging us to find IGES owed an independent duty to the Hayeses. But we can only interpret and apply the statute enacted by the legislature. In the area of "design and construction," the legislature requires parties to protect their financial interests through contracts. Beyond that, "we are not at liberty to graft onto the statute an exception that our legislature chose not to include." *Reperex Inc. v. Child, Van Wagoner & Bradshaw*, 2017 UT App 25, ¶ 71, 392 P.3d 905, *reversed in part on other grounds by Reperex, Inc. v. Coldwell Banker Com.*, 2018 UT 51, 428 P.3d 1082; *see also Davencourt at Pilgrim's Landing Homeowners Ass'n v. Davencourt at Pilgrim's Landing, LC*, 2009 UT 65, ¶ 44, 221 P.3d 234 ("If a statutory duty is to exist that lies outside the scope of the economic loss rule, we leave it to the decision of the legislature.").[8]

¶38 As no independent duty exception is included in the Economic Loss Statute, we affirm.

---

[8] We note that even though *Davencourt* was issued after the enactment of the Economic Loss Statute, the events in question occurred before enactment of the Statute and we applied the common law economic loss rule. *See Davencourt at Pilgrim's Landing Homeowners Ass'n v. Davencourt at Pilgrim's Landing, LC*, 2009 UT 65, ¶¶ 16–19, 221 P.3d 234.

## CONCLUSION

¶39 We conclude that the Hayeses' claims against IGES constitute "action[s] for defective design," subject to the Economic Loss Statute. Further, none of the exceptions provided in the Statute apply to the circumstances here.

¶40 We affirm.

———————